Richard Max STRAHAN, Plaintiff,

v.

Rear Admiral John L. LINNON, Commander First District, United States Coast Guard; Admiral Robert E. Kramek, Commandant, United States Coast Guard; Michael Kantor, Secretary, United States Department of Commerce; D. James Baker, Administrator, National Oceanic and Atmospheric Administration; and Roland Schmitten, Assistant Administrator, National Marine Fisheries Service, Defendants.

Civ. A. No. 94–11128–DPW.

United States District Court,
D. Massachusetts.

May 20, 1997.

Richard D. Belin, Wendy B. Jacobs, Jonathan M. Ettinger, Adam Kahn, Foley, Hoag & Eliot, Boston, MA, for Richard Max Strahan.

Richard Max Strahan, Boston, MA, pro se.

Elinor Colbourn, Teri R. Thomsen, U.S. Department of Justice, Environmental and Natural Resources Div., Wildlife & Marine Resources Section, Washington, DC, George B. Henderson, United States Attorney's Office, Boston, MA, John L. Marshall, U.S. Department of Justice, Wildlife & Marine Resources Section, Environmental Division, U.S. Dept. of Justice, Edward A. Boling, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for John L. and William J. Kime.

Ansel B. Chaplin, Chaplin & Milstein, Boston, MA, Anne Kenney Chaplin, Chaplin & Chaplin, Boston, MA, for Center for Coastal Studies.

Edward A. Boling, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Robert E. Kramek, Michael Kantor, D. James Baker and Roland Schmitten.

## MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

The Amended Complaint in this action contains headings for twenty-three counts variously alleging that the defendants, the United States Coast Guard and the Secretary of Commerce, have violated several federal statutes, including the Endangered Species Act, the National Environmental Policy Act, the Marine Mammal Protection Act, and the Ad-

ministrative Procedure Act.[1] Broadly stated, the plaintiff asserts that the defendants have addressed inadequately the impact of Coast Guard activities on various endangered marine mammals, especially the Northern Right whale. Plaintiff contends that such compliance with law as the defendants have manifested is the result only of specific mandate from this Court and that further decrees are required to secure full compliance.

The defendants now move for summary judgment on all counts arguing that they have complied with the mandates of the several statutes. The plaintiff has filed a cross motion for partial summary judgment contending the defendants' purported compliance has been inadequate and that, accordingly, the actions—and inaction—of defendants still present a threat to the endangered marine mammals.

I will grant full summary judgment to the defendants.

## I. Background

In June, 1994, plaintiff Max Strahan filed the original complaint in this action *pro se* against defendants Rear Admiral John L. Linnon and Admiral Robert E. Kramek of the United States Coast Guard. The original complaint alleged violations of four federal statutes: the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the Marine Mammal Protection Act ("MMPA"), and the Whaling Convention Act.[2] Strahan moved for a preliminary injunction and the defendants moved for summary judgment.

By a Memorandum and Order issued on May 2, 1995[3], *Strahan v. Linnon*, 967 F.Supp. 609 (D.Mass.1995), I granted sum-

mary judgment for the defendants on several of the counts in the complaint. Due to the "defendants' dilatoriness and neglect in initiating mandated procedures," however, I declined to grant summary judgment to the defendants on the counts regarding ESA consultation, conservation and permitting; MMPA permitting; and NEPA environmental assessment preparation. Memorandum and Order, at 2. I also granted, in part, Strahan's motion for a preliminary injunction, "to the extent of directing that the Coast Guard initiate and expeditiously fulfill the procedural requirements of the ESA, MMPA, and NEPA." *Infra* at 610.

Following that order, the Coast Guard on August 1, 1995, submitted a "Final [ESA] Biological Assessment for the U.S. Atlantic Coast" ("BA") to the National Marine Fisheries Service (NMFS) to aid consultation over its operations. Dft's Memo, at 7. Then, on September 15, 1995, NMFS issued its 1995 Biological Opinion ("BO") on U.S. Coast Guard Vessel and Aircraft Activities along the Atlantic Coast. In that Biological Opinion, NMFS concluded that long-term continuation of Coast Guard activities was not likely to jeopardize any listed species. *See* 1995 BO, at 39. (FEIS Vol. I, App. C.) The 1995 Biological Opinion also stated, however, that consultation must be reinitiated if an endangered whale was struck or injured by a Coast Guard vessel. *Id.* at 40. On September 22, 1995, the Coast Guard published an Environmental Assessment of Potential Impacts of U.S. Coast Guard Activities Along the U.S. Atlantic Coast ("EA") and a proposed Finding of No Significant Impact ("FONSI").[4] (*Id.*, App. D.) During September and October of 1995, the Coast Guard received comments on its Environmental Assessment, many of which urged the Coast Guard to reconsider its FONSI determination and issue an Envi-

---

1. Of the twenty-three counts, Strahan purposefully omitted Counts VIII and XI. Accordingly, those counts are treated as dismissed.

2. As with most complex environmental cases, understanding the language of this proceeding requires familiarity with an alphabet soup of statutes, agencies, reports and programs. A lexicon of acronyms is attached as Appendix I to this Memorandum.

3. The May 2, 1995, Memorandum and Order, which did not finally resolve issues in this case, was not submitted for publication in the reporter

services. Because there is substantial cross-referencing to the May 2, 1995, Memorandum and Order in the instant Memorandum and Orders, the May 2, 1995, Memorandum and Order (as corrected May 19, 1995) is attached to the instant Memorandum and Orders as Appendix II, *infra* at 609, in order to provide the reader with the full analysis upon which the final resolution is based.

4. When an Environmental Assessment results in a FONSI, the consultation process is over. No Environmental Impact Statement is required.

ronmental Impact Statement ("EIS"). *See* FEIS, at 2–2.

On October 9, 1995, the Coast Guard Cutter *Reliance* struck a Humpback whale. *Id.* Additionally, an increased number of Right whale mortalities was observed during the 1995–1996 Northern Right whale calving season. *Id.* Because of these developments, the Coast Guard reinitiated consultations with NMFS on February 22, 1996. *Id.* Then, on July 22, 1996, NMFS issued a second Biological Opinion on the reinitiated consultation. *See* FEIS, Vol. I, Exh. F. "Based primarily on the new information which indicated that the right whale population might be experiencing a decline, the 1996 Biological Opinion found that the Coast Guard activities were likely to jeopardize the continued existence of northern right whales." *Id.* at 24. Because of its "jeopardy" finding, NMFS proposed a Reasonable and Prudent Alternative ("RPA") which it found was likely to avoid jeopardy to the species. *Id.* at 26–29.

During the same time period, the Coast Guard determined that it could not reach a FONSI and that an additional environmental analysis was necessary. *See* FEIS, at 1–3. On April 2, 1996, therefore, the Coast Guard published a Notice of Intent to prepare a Draft Environmental Impact Statement ("DEIS") and a Scoping Notice in the Federal Register. *Id.* at 2–2. The DEIS was published for public review and comment on July 31, 1996. *Id.* at 1–3, App. Q. The DEIS promoted the Atlantic Protected Living Marine Resources ("APLMR") Initiative as the preferred alternative. After receiving and analyzing public comments, the Coast Guard published the FEIS on October 31, 1996. After a mandatory period of public review, on December 9, 1996, the Coast Guard issued its Record of Decision ("ROD") which adopted the APLMR Initiative. (Administrative Record, Vol. IV, Doc. 656.)

Meanwhile, NMFS was also engaged in other activities in order to lessen the dimin-

ishment of the Right whale population. For example, in or about August, 1996, NMFS established a Large Whale Take Reduction Team ("TRT") under the MMPA. *See* 61 Fed.Reg. 40819 (August 6, 1996). On January 2, 1997, NMFS issued a final rule classifying inshore and offshore lobster fisheries as Category I fisheries under the MMPA. *See* 62 Fed.Reg. 33. Despite the fact that the TRT did not reach consensus, it submitted a draft Take Reduction Plan ("TRP") to NMFS on February 1, 1997. On April 1, 1997, NMFS filed its proposed final TRP in the Federal Register. *See* Dft's Reply, Exh. C. Last, on February 13, 1997, NMFS issued an interim final rule restricting approaches within 500 yards of Right whales, whether by vessel, aircraft or other means. 62 Fed.Reg. 6729 (Feb. 13, 1997).

Unsatisfied by the defendants' consultation and conservation efforts and now represented by counsel and joined by a new co-plaintiff, Strahan moved to file an amended complaint on May 21, 1996,[5] which I allowed after oral argument on June 19, 1996. A discovery and briefing schedule was established. On March 7, 1997, the defendants filed a motion for summary judgment on all counts, arguing, *inter alia*, that they had completed the consultation process and that their various conservation plans and environmental assessments were in place, satisfactory and would adequately protect endangered species. The plaintiff moved for partial summary judgment the same day. The plaintiff generally attacks the results of the consultation process and argues that the defendants have not adequately insured that the Northern Right whale will not continue to be jeopardized by Coast Guard and NMFS actions and inaction.

## II. Procedural Arguments

 Before addressing the substantive issues in this case, I must consider several procedural arguments advanced by the defendants to deflect certain of the plaintiff's

---

5. The Amended Complaint added The Fund for Animals, Inc. as a plaintiff and added Michael Kantor, Secretary, United States Department of Commerce; D. James Baker, Administrator, National Oceanic and Atmospheric Administration, and Roland Schmitten, Assistant Administrator, National Marine Fisheries Service as defendants.

Co-plaintiff Fund for Animals filed an assented to stipulation of dismissal of its claims at the hearing on summary judgment on May 7, 1997. Mr. Strahan has now returned to his position as sole plaintiff. Thus, the plaintiff is referred to in the singular in assessing the motions pending before me.

claims. First, the defendants assert that Count XII of the Amended Complaint, which alleges that NMFS violated Section 7 of the ESA because the 1995 Biological Opinion ("BO") "fails to meet the requirements of the ESA," is moot because the 1995 Biological Opinion has been superseded by the 1996 Biological Opinion. I agree with the defendants that the claim against the 1995 Biological Opinion is now moot because the 1995 Biological Opinion is no longer in effect and "the challenged actions are now water over the spillway, as it were." *Idaho Dep't of Fish & Game v. NMFS*, 56 F.3d 1071, 1074 (9th Cir.1995).[6] The plaintiff has had ample time to move to amend his complaint and has failed to do so in accordance with Fed. R.Civ.P. 15 in order to restate his claims formally as to the 1996 Biological Opinion. Nevertheless, despite the lack of formal amendments or supplementation, the parties have understood the 1996 Biological Opinion is in dispute. The defendants have addressed the adequacy of the 1996 Biological Opinion in their supporting memoranda and they "will suffer no apparent prejudice as a result of supplementation." *Structural Systems, Inc. v. Sulfaro*, 692 F.Supp. 34, 35–36 (D.Mass.1988). Accordingly, I will treat the pleadings as supplemented[7] with respect to Count XII.[8]

The defendants also assert that Counts XV and XVI of the Amended Complaint, alleging that the defendants have violated sections 117 and 118 of the Marine Mammal Protection Act ("MMPA") because they have not created a Take Reduction Team ("TRT")or issued a Take Reduction Plan ("TRP"), are moot because a TRT has been formed and, they argue, that NMFS will issue a final TRP by July 15, 1997. To the contrary, the plaintiff argues that the TRP alluded to by the defendants does not satisfy the MMPA's requirements because the TRT could not reach a consensus on the plan. The statute requires that if a TRP is not reached by consensus "the Secretary shall take the draft take reduction plan into consideration and ... shall publish in the Federal Register the plan proposed by the team...." 16 U.S.C. § 1387(f)(7)(B)(i). I find that the defendants have complied with the statute in so far as the Secretary filed its proposed TRP in the Federal Register on April 1, 1997. *See* Dft's Reply, Exh. C. The plaintiff still contends, nevertheless, that his claims are not moot because of the further allegation that the defendants did not adhere to the time limits mandated in the MMPA. Even if I found that the defendants did not previously comply with the statute's time restrictions,[9] however, plaintiff's claim would still be moot because there would be no

**6.** The plaintiff's claims are not saved from mootness by the capable of repetition yet evading review doctrine for two reasons. First, the 1996 Biological Opinion was based on different information than the 1995 Biological Opinion. In fact, the 1996 Biological Opinion comes to an entirely different conclusion regarding the status of the Northern Right whale. Accordingly, the inadequacies of the 1995 Biological Opinion are not "capable of repetition." Moreover, as demonstrated by this lawsuit, the plaintiff has been able to obtain judicial review before the 1996 Biological Opinion has expired. *Cf. Idaho Dep't of Fish & Game*, 56 F.3d at 1075.

**7.** A motion to supplement the pleadings under Fed.R.Civ.P. 15(d) is proper, rather than a motion to amend under Rule 15(c) because "supplemented" pleadings are based on events that took place subsequent to the filing of the original pleadings. *See Structural Systems, Inc. v. Sulfaro*, 692 F.Supp. 34, 36 (D.Mass.1988).

**8.** I will also treat Count III as supplemented because the parties address the merits of the Conservation Plan embodied in the APLMR Ini-

tiative adopted by the Coast Guard in its December 9, 1996 ROD, in their supporting papers.

**9.** I note that because of the great degree of flexibility afforded to the defendants by section 118(f)(3) of the MMPA, plaintiff's timeliness claim would fail, in any event. Section 118(f)(3) states that "[i]f there is insufficient funding available to develop and implement a take reduction plan for all such stocks," the Secretary may prioritize. 16 U.S.C. § 1387(f)(3). The plaintiff argues that the budget available to the defendants during the relevant time period was sufficient to fund a TRT. *See* Pl's Opp., at 4 (citing NOAA Summary of the President's Budget Fiscal Year 1996, Pl's Exh. B., at 23). I find this contention wholly unsupported by the cited evidence. Moreover, I am persuaded by the declaration of Thomas Clifton Eagle which describes the prioritization process that NMFS followed in determining what TRTs would be established. *See* Declaration of Thomas Clifton Eagle ¶¶ 4–7 (Dft's Opp. to Pl's Motion for Preliminary Injunction, Exh. A, *in* Aff. of Jonathan M. Ettinger, Vol. V, Exh. 81.)

available relief. Accordingly, I find that Counts XV and XVI are moot. I similarly find that Count XVII, alleging NMFS has not classified the lobster fishery in Category I, is moot because NMFS issued a final rule on fishery classifications which included classification of inshore and offshore lobster fisheries as Category I fisheries on January 2, 1997. *See* 62 Fed.Reg. 33.

## III. ESA

The plaintiff asserts various claims that the defendants have violated the ESA. These claims allege that the Coast Guard violated § 7 because its Biological Assessment did not meet the requirements of the ESA (Count I); that the Coast Guard violated § 7(a)(2) by failing to consult with NMFS before issuing permits for certain vessels (Count II); that the Coast Guard violated § 7(a)(1) by failing to implement a conservation plan (Count III); that the Coast Guard violated § 7(a)(2) by issuing Certificates of Inspection to vessels of commercial whale-watching companies "that intentionally pursue and commercially exploit listed endangered species." (Count V); that the Coast Guard has violated "the legal duties imposed on it by 16 U.S.C. § 1540(e)(1) to conserve and protect the Northern Right whale" by failing to enforce the prohibitions of the ESA (Count VI); that the Coast Guard has taken Northern Right whales in violation of Section 9 of the ESA, 16 U.S.C. § 1538 (Count IX); that NMFS violated section 7 of the ESA by failing to issue an adequate Biological Opinion (Count XII); that NMFS violated section 4 of the ESA by failing to adopt and implement an adequate recovery plan and conservation pro-

gram (Count XIII); that NMFS violated section 11 of the ESA by adopting a policy of non-enforcement (Count XXII); and that NMFS violated section 6 of the ESA by improperly entering into a Cooperative Agreement with the Commonwealth of Massachusetts (Count XXIII). I will address each of these Counts individually.[10]

### 1. The Biological Assessment and Opinions

In Counts I and XII, the plaintiff challenges, respectively, the adequacy of the Coast Guard's Biological Assessment ("BA") and NMFS's Biological Opinions ("BO").[11] Both the plaintiff and the defendants move for summary judgment on these counts. Although I address the adequacy of the Biological Assessment and the Biological Opinions separately, I find that the analyses are largely similar. I begin with a detailed discussion of the Biological Opinions followed by a briefer analysis of the Biological Assessment.

### A. The Biological Opinions

### 1. Procedural Defenses

The defendants attempt initially to dispose of Count XII on various procedural grounds. I do not find these arguments persuasive.

First, the defendants assert that the Biological Opinions are not final agency action and, accordingly, that they may not be reviewed by this Court under the Administrative Procedure Act ("APA"). This argument was rejected recently by the Supreme Court in *Bennett v. Spear,* —— U.S. ——, 117

---

**10.** In my Memorandum and Order of May 2, 1995, I granted the defendants' motion for summary judgment on Counts II (ESA—Certificates of Documentation and Inspection), V (ESA—whale watch vessels), and VI (ESA enforcement). *See Strahan v. Linnon,* CA No. 94–11128–DPW, Memorandum and Order, May 2, 1995, *infra* at 610. I allowed the plaintiff's motion to file an amended complaint on June 19, 1996. I have reexamined these claims as reasserted in the Amended Complaint. I find that the plaintiff has not added any new evidence in support of Counts II, V, and VI and I will, therefore grant summary judgment for the defendants on these Counts again for the reasons stated in the May 2, 1995 Memorandum and Order. I also granted summary judgment for the defendants on Counts VII

(MMPA enforcement) and VIII (WCA enforcement) in my May 2, 1995 Order and Memorandum. With respect to Count VII, the plaintiff still has not provided sufficient evidence to overcome the presumption of nonreviewability of agency decisions not to enforce. Accordingly, I grant summary judgment to the defendants on this count again.

**11.** Although I have determined that plaintiff's claims regarding the 1995 Biological Opinion are moot and I have treated Count XII as supplemented to include the 1996 Biological Opinion, I will refer to both the 1995 and 1996 Biological Opinions in my discussion because the reports are interrelated and contain multiple cross-references. *See, e.g.,* 1996 BO at 12.

S.Ct. 1154, 137 L.Ed.2d 281 (1997). Addressing this precise issue, that Court stated:

> As a general matter, two considerations must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decision-making process, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

*Id.* at ——, 117 S.Ct. at 1168. Based on this analysis, the Court then held that a Biological Opinion satisfied the requirements and constituted final agency action. *Id.* at —— ——, 117 S.Ct. at 1168–69.

■ The defendants argue another point addressed adversely to them by the Supreme Court in *Bennett.* They assert that the citizen-suit provision in the ESA, 16 U.S.C. § 1540(g)(1)(A), provides no basis for the plaintiff's challenge to the Biological Opinions. In *Bennett*, the Supreme Court found this argument persuasive on the facts there presented and concluded that the plaintiffs could not challenge the adequacy of a Biological Opinion *under the ESA.* Explaining its reasoning, the Court stated:

> [Section] 1540(g)(1)(C) expressly authorizes suit against the Secretary but only to compel him to perform a nondiscretionary duty under § 1533. That provision would be superfluous—and, worse still, its careful limitation to § 1533 would be nullified—if § 1540(g)(1)(A) permitted suit against the Secretary for any "violation" of the ESA.

*Id.* at ——, 117 S.Ct. at 1166. This finding as to the ESA, however, does not preclude judicial review of the Biological Opinions on another basis. In fact, after rejecting the plaintiffs' challenge to the biological opinions

under the ESA, the Supreme Court in *Bennett* found:

> No one contends (and it would not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen-suit provision are exclusive, supplanting those provided by the APA. The APA, by its terms, provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

*Id.* at ——, 117 S.Ct. at 1167. Thus, I find that the plaintiff's § 1536 claims are reviewable under the APA.

■ The last procedural argument advanced by the defendants is that the plaintiff has failed to comply with the 60–day notice requirement contained in ESA § 11(g)(2)(A). I am not persuaded by this argument. First, at an earlier hearing in this case, held on June 19, 1996, I determined, and the parties agreed, that the notice provided was sufficient as to the claims of the Amended Complaint. *See* Supp. Aff. of Jonathan M. Ettinger, Exh. D, at 33. Given the history of this litigation, coupled with plaintiff Strahan's "zealous advocacy," (of which the defendants are well aware) the pleadings provided defendants fair notice that the plaintiff would challenge the substance of the related Biological Opinions.[12] Last, because I have determined that the plaintiff's § 1536 claims regarding the sufficiency of the Biological Opinions lies under the APA, rather than the ESA, it does not appear that the 60–day notice requirement even applies in the present action.

### 2. Substantive Challenges

The Amended Complaint alleges that the 1995 and 1996 Biological Opinions are plagued by various substantive inadequacies.

■ a. *"cumulative effects"* . The plaintiff's assertion that the Biological Opinions failed "to adequately evaluate the cumulative impacts of all marine events, including Coast Guard and non-Coast Guard vessels," (Am. Complaint ¶¶ 54b(1), 105(a)), is not borne out by the record. "Cumulative effects" are de-

---

**12.** Under the circumstances, I decline to follow the holding in *Lone Rock Timber Co. v. U.S. Dep't*

*of the Interior,* 842 F.Supp. 433 (D.Or.1994).

fined in 50 C.F.R. § 402.02 as "those effects of future state or private activities . . . that are reasonably certain to occur within the action area of the federal action subject to consultation." I find that the 1995 and 1996 Biological Opinions satisfy this standard. In particular, both Biological Opinions contain thorough discussions of the impact of non-Coast Guard vessels on the Northern Right whale. *See* 1995 BO at 36–38, FEIS Vol. I, App. C., 1996 BO at 23–24, FEIS Vol. I, App. F.

■ b. *"best scientific and commercial data"*. The plaintiff's contention that the Biological Opinions are deficient because they failed to "use the best scientific and commercial data available," 50 C.F.R. § 402.14(g)(8), is also unsupported by the record. The plaintiff specifically alleges that NMFS used stale data from 1992, that NMFS did not attempt to obtain current population data that was available at the time the Biological Opinions were prepared, and that NMFS "did not perform any population viability analysis or model the effects of ship-whale interactions or perform a risk assessment to determine density and likelihood of conflicts between usage by vessels and whales in areas used by both." Pl's Memo, at 11. If true, plaintiff's contentions would render the Biological Opinions insufficient under the ESA. *See Roosevelt Campobello Int'l Park Comm'n v. U.S. E.P.A.*, 684 F.2d 1041, 1049 (1st Cir.1982); *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir.1994); *Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir.1988), *cert. denied sub. nom., Sun Exploration and Production v. Lujan*, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). I find, however, that NMFS used the best scientific and commercial data available to it in formulating the Biological Opinions.

The plaintiff's allegation that the Biological Opinions rely on stale data from 1992 is inaccurate. Indeed, the 1996 Biological Opinion specifically refers to the new data it relies on, stating:

> The new information is the number of mortalities documented in the past 12 months and information from the right whale identification catalogue which compares current ·and past mortalities to known births to give a perspective on the population trend since 1980. Also, locations of carcasses of some of the 196 mortalities, as well as preliminary offshore aerial survey data (GADNER, unpublished data) and sightings. . . .

1996 BO at 12. In the next several pages of the Biological Opinion, these developments are discussed individually in greater detail. *See id.* at 12–18. Moreover, the 1996 Biological Opinion also reports about information it received from the New England Aquarium in the several months before the Biological Opinion was published. *See id.* at 15–16. Accordingly, I find the plaintiff's allegation that the defendants "did not even attempt to obtain" current information to be plainly false. In fact, rather than "ignore available biological data," *Conner*, 848 F.2d at 1454, NMFS expressly incorporated such information into its 1996 Biological Opinions. *See, e.g.*, 1996 BO, at 19 (assessing change in environmental baseline due to "recent documented mortalities") .[13]

With respect to the plaintiff's assertions that NMFS did not perform population viability analyses or model the effects of whale-ship interactions, I do not find that these "deficiencies" constitute a failure to use the best scientific and commercial data available. *Roosevelt Campobello*, a case the plaintiff cites for support, is readily distinguishable. In *Roosevelt Campobello*, the First Circuit determined that the Coast Guard did not use

---

**13.** I find the plaintiff's reference to the deposition testimony of P. Michael Payne to add little support to plaintiff's arguments. At most, Payne states that the University of Rhode Island "could have had some additional data." Payne Depo., at 3–53 (Ettinger Aff., Vol. II, Exh. 24.) This statement does not demonstrate that the defendants "ignore[d] available biological information." *Conner*, 848 F.2d at 1454. In fact, the defendants in *Conner* "took the position that

there was insufficient information to prepare comprehensive biological opinions." *Id.* at 1453. Finding this unacceptable, the court there stated that "extensive information about the behavior and habitat of the species was available." *Id.* Here, to the contrary, there is no evidence in the record to indicate that there was "extensive information," or even useful information, that the defendants did not use in the Biological Opinion.

the best scientific data because it did not perform a "real time simulation." *Roosevelt Campobello*, 684 F.2d at 1052–55. In that case, however, "[a]ll the witnesses [in the administrative hearing] have agreed that real time simulation studies would contribute a more precise appreciation of risks of collision and grounding. We think the same could be said of a hydrographic survey of the depth of the channel, and perhaps of trial runs by VLCCs in ballast." *Id.* at 1055. In this case, by contrast, there is no evidence indicating that modeling and population viability analyses would "contribute a more precise appreciation of risks." While the plaintiff insists that "[a]n analysis of the distribution of whales and ships would enable NMFS and the Coast Guard to better determine the risks of ships striking whales," Pl's Reply, at 7, this conclusory assertion does not constitute adequate evidence. As in *Bays' Legal Fund v. Browner*, 828 F.Supp. 102 (D.Mass. 1993), where the court dismissed the plaintiffs' claims that the EPA did not use the best scientific data available, I find that "the plaintiffs never produce any evidence that the data on which the EPA relied ... was inferior in any way. They only make the conclusory allegation that [the study] ... could have [been] performed ... with greater expertise." *Id.* at 106 n. 7. Accordingly, I find that NMFS has satisfied its duty to use the best scientific and commercial data available, as required by § 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).

Because I find that the Biological Opinions adequately analyze the cumulative impact of the proposed action and that they employ the best scientific and commercial data, I find that they withstand scrutiny under the arbitrary and capricious standard of the APA. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir.1990)("Judicial review of administrative decisions involving the ESA is governed by section 706 of the Administrative Procedure Act."); *Bays' Legal Fund*, 828

F.Supp. at 107 ("Therefore, to succeed, the plaintiffs must establish that ... the scientific determinations ... were arbitrary and capricious."). I will grant summary judgment for the defendants on Count XII.

## B. The Biological Assessment

The plaintiff attacks the Biological Assessment ("BA") on largely the same grounds that he faults the Biological Opinions. Therefore, the analysis of the plaintiff's claims with respect to the Biological Assessment will echo the discussion of the Biological Opinions. There is one difference worth noting, however, because it informs the entire analysis. Unlike the Biological Opinion, the contents of the Biological Assessment are discretionary. The applicable regulations state that "[t]he contents of a biological assessment are at the discretion of the [action] agency and will depend on the nature of the Federal action." 50 C.F.R. § 402.12. *See also Bays' Legal Fund*, 828 F.Supp. at 110 n. 19 ("there are no strict requirements for what the biological assessment should include; its contents are discretionary with the agency preparing it.").[14] Accordingly, the Court's review of the Biological Assessment will be less searching than its consideration of the Biological Opinions.

First, the plaintiff asserts that the Biological Assessment did not discuss adequately the cumulative impacts of "all marine events." Am. Complaint § 54b(1). Although it contains a briefer discussion of the cumulative impacts of Coast Guard and non-Coast Guard activities than the Biological Opinions, I find that the Biological Assessment does discuss the cumulative impacts such as "pollution, oil and gas exploration, sea-bed mining, and a general increase in coastal activities due to an increase in human population along the east coast." BA at 3–7–3–10 (AR Vol. III). The plaintiff next contends that the Coast

---

**14.** The regulation does list certain criteria that the agency may consider. These include: (1) the results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally; (2) the views of recognized experts on the species at issue; (3) a review of the literature and other

information; (4) an analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies; (5) an analysis of alternate actions considered by the Federal agency for the proposed action. 50 C.F.R. § 402.12(f).

Guard did not "use sufficiently qualified personnel and the best scientific data available" in the Biological Assessment. (Am. Complaint ¶ 54b(2) .) In the first instance, I do not find any support in the ESA or in the cases cited by the plaintiffs, for the assertion that Biological Assessments must employ personnel or scientific data of a particular quality. In fact, each case cited by the plaintiffs in this section discusses the statutory requirements for either Biological Opinions or Environmental Impact Statements. *See Carmel–by–the–Sea v. U.S. Dep't of Trans.*, 95 F.3d 892, 900 (9th Cir.1996) (EIS); *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir.1993) (BO); *Roosevelt Campobello*, 684 F.2d at 1052 n. 9 (EIS). In any event, the plaintiff does not produce any evidence that the data used by the Coast Guard was outdated or incorrect [15] or that the personnel involved were inadequate to the task.

■ Last, the plaintiff asserts that the Biological Assessment did not consider adequately "meaningful alternatives to the proposed action." Am. Complaint ¶ 54b(3). Again, I find this assertion to be contrary to the evidence in the Biological Assessment itself. Indeed, the Biological Assessment devotes an entire chapter to "Proposed Action and Alternatives to Proposed Action." *See* BA, Chapter 5. Briefly, the alternatives discussed include (1) the preferred alternative, (2) the reduction of vessel speed and the increase of aircraft altitude when endangered species are expected to be in the area, (3) reduction of vessel speed and increase in aircraft altitude at all times, (4) avoidance of all high use areas, and (5) cessation of USCG patrolling of the Atlantic Coast. *See id.* at 5–4–5–5. I find that this discussion is sufficient. Accordingly, I find that the Coast Guard's Biological Assessment is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). I will grant summary judgment to the defendants on Count I.

## 2. The Conservation Program and Recovery Plan

■ In Count III of the Amended Complaint the plaintiff alleges that the Coast Guard's conservation program is "substantially deficient" and therefore violative of § 7(a)(1) of the ESA. Similarly, Count XIII alleges that NMFS has not adopted recovery plans for federally protected whales other than the Right and Humpback whales. Therefore, the plaintiff contends that NMFS has violated 16 U.S.C. § 1533(f) which requires NMFS to "develop and implement" such plans. Both the plaintiff and the defendants move for summary judgment on these counts.

### A. The Conservation Program

Section 7(a)(1) states that federal agencies "shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species...." 16 U.S.C. § 1536(a)(1). The plaintiff asserts that the Coast Guard has violated § 7(a)(1) because the APLMR Initiative, adopted as the preferred alternative in the FEIS and then in the ROD, "cannot be considered an adequate conservation program as required by the ESA." Pl's Memo, at 24. Specifically, the plaintiff argues that the APLMR "does not contain specific measures 'necessary ... to prevent the loss of any endangered [whales].'" Pl's Memo, at 24 (citing *Roosevelt Campobello*, 684 F.2d at 1049 )(citing *TVA v. Hill*, 437 U.S. 153, 185, 188 n. 34, 98 S.Ct. 2279, 2297, 2299 n. 34, 57 L.Ed.2d 117 (1978)). I do not find this argument persuasive because the plaintiff has not demonstrated, in any meaningful sense, specific

---

**15.** The plaintiffs cite several paragraphs in their Statement of Facts to support the contention that better, newer data was available to the Coast Guard. The cited statements, however, are broad assertions that the University of Rhode Island and the New England Aquarium had certain data in its possession. Additionally, these statements do not even apply to the Coast Guard,

but rather allege that NMFS could have obtained such data. *See* SOF at ¶¶ 40–41. Moreover, the plaintiffs' allegations that the Biological Assessment did not include population viability analyses and modeling of ship-whale interactions fail for the same reasons as discussed with respect to the Biological Opinions.

measures that are necessary to prevent the loss of any endangered species that are missing from the APLMR. The only problem the plaintiff identifies is that the plan "establishes neither speed limits nor distance rules for non-Coast Guard vessels." *Id.* at 25. I do not find this a fatal flaw. In fact, the APLMR addresses, directly, the issue of controlling non-Coast Guard vessels, stating that "[t]he NMFS, which has the biologists and the resources needed to consider and develop [approach and distance rules for non-Coast Guard vessels], has already undertaken this proposal and the USCG will continue to support [its] efforts.... " BO, at 3–14.[16]

In any event, conservation plans, under § 7(a)(1) are "voluntary measures that the federal agency has the discretion to undertake" and "the Act does not mandate particular actions be taken by Federal agencies to implement § 7(a)(1)." 51 Fed.Reg. 19926, 19931, 19934. If the Coast Guard was forced to impose distance and speed restrictions, or other specific measures in order to fulfill its duty to conserve under § 7(a)(1), the Coast Guard "would [be] divest[ed] ... of virtually all discretion on deciding how to fulfill its duty to conserve. We have recognized that the Secretary is to be afforded some discretion in ascertaining how best to fulfill the mandate to conserve under section 7(a)(1)." *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy,* 898 F.2d 1410, 1418 (9th Cir.1990).

*TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) does not compel a finding that the Coast Guard must adopt specific measures in order to comply with § 7(a)(1). In *TVA,* it was undisputed that the proposed agency action would "either eradicate the known population of snail darters or destroy

their critical habitat." *Id.* at 172, 98 S.Ct. at 2291. The situation here is entirely distinguishable because the effects of Coast Guard activity, themselves, are not the center of plaintiff's § 7(a)(1) claim. Rather, the dispute is about the necessity of adopting specific protective measures in the conservation program. It is not suggested by the plaintiff that without the speed and distance rules, Northern Right whales face such imminent eradication. Moreover, the holding in *TVA* was premised on § 7(a)(2), while § 7(a)(1) is at issue here.[17] Because "[a]n agency's duty to consult ... does not divest it of discretion to make a final decision that 'it has taken all necessary action to insure that its actions will not jeopardize the continued existence of an endangered species,'" *Roosevelt Campobello,* 684 F.2d at 1049 (quoting *National Wildlife Fed'n v. Coleman,* 529 F.2d 359, 371 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976)), I find that the APLMR adopted by the Coast Guard fulfills the requirements of § 7(a)(1). I will grant summary judgment for the defendants on Count III.

## B. The Recovery Plan

The plaintiff, in Count XIII, alleges that NMFS has violated § 4(f) of the ESA, 16 U.S.C. § 1533(f) because it has not "develop[ed] and implement[ed] plans for the conservation and survival of endangered species and threatened species ...." 16 U.S.C. § 1533(f). Plaintiff makes two separate arguments with respect to NMFS's recovery plans. First, he contends that NMFS has violated the ESA because it has not developed any recovery plans for the Blue, Sei, Fin, or Minke whales, but only the Right and Humpback whales. The plaintiff then alleges that the existing Right whale recovery plan

---

**16.** I note that on February 13, 1997, NMFS published an Interim Final Rule in the Federal Register which incorporates distance and speed restrictions on non-Coast Guard vessels. See 62 Fed.Reg. 6729. Specifically, the rule restricts vessel and aircraft approaches within 500 yards of a Right whale. If a vessel or aircraft comes within 500 yards of a Right whale, the rule directs that it depart from the area at a slow, safe speed. *Id.*

**17.** Section 7(a)(2)'s mandate is stricter and more precise than § 7(a)(1)'s vaguer directive. For

example, § 7(a)(2) *"requires* Federal agencies, in consultation with and with the assistance of the Secretary, to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any listed species ... " 51 Fed.Reg. 19926 (emphasis added). By comparison, § 7(a)(1) *"authorizes* Federal agencies ... to utilize their resources in furtherance of the purposes of the Act by carrying out programs for the conservation of endangered species and threatened species...." *Id.*

is insufficient because it does not "incorporate implementable site-specific management actions necessary to achieve the plan's goal ... " and because it does not "establish a realistic recovery goal." Am. Complaint ¶ 108. The Amended Complaint further alleges that the existing plan has not been revised.

With respect to the claim that NMFS has violated § 4(f) because it has not developed recovery plans for federally protected whales other than Right and Humpback whales, the defendants respond that the there are no time limits in § 4(f) within which the Secretary must develop, implement, or revise a recovery plan. I am persuaded by the defendants' argument. *See Oregon Natural Resource Council v. Turner*, 863 F.Supp. 1277, 1282–83 (D.Or.1994). The court observed:

> Congress recognized that the development of recovery plans for listed species would take significant time and resources. It therefore provided in the ESA that the Secretary could establish a priority system for developing and implementing such plans. This priority system allows the Secretary broad discretion to allocate scarce resources to those species that he or she determines would most likely benefit from development of a recovery plan. Unlike other requirements under the ESA, such as the designation of critical habitat, the statute places no time constraints on the development of recovery plans. See 16 U.S.C. § 1533(f).

*Id.* at 1283.[18] Accordingly, the Secretary has developed a priority system for developing such recovery plans. *See* 55 Fed. Reg. 24296. I find, therefore, that the fact that NMFS has not issued recovery plans for Sei, Blue, and Fin whales[19] does not constitute a violation of § 4(f).

The plaintiff also asserts that the recovery plans that do exist, are deficient and thus violative of the statute. He claims that "as a general matter, [the recovery plan] does not contain objective, scientific, measurable criteria." Pl's Opp., at 13. More specifically, the plaintiff contends that the plan "fails to include ... an annual census, a population viability analysis, modeling of ship-whale interactions, risk analysis, and interim numerical goals." *Id.* at 14 (citing Affidavit of Robert D. Stevenson, Pl's Exh. H, at 3–6). The defendants assert that the discretionary nature of a recovery plan also applies to the plan's content and that "it is not necessary for a recovery plan to be an exhaustively detailed document." Dft's Memo, at 25 (quoting *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 107 (D.D.C.1995)).

Case law instructs that the defendants are correct in their assertion that the content of recovery plans is discretionary. For example, in *Fund for Animals, Inc. v. Rice*, 85 F.3d 535 (11th Cir.1996), the plaintiffs' argument relied on the assumption that "Recovery Plan[s][are] document[s] with the force of law." *Id.* at 547. The court rejected that characterization stating that "[s]ection 4(f) makes it plain that recovery plans are for guidance purposes only." *Id.* Similarly, the court in *Morrill v. Lujan*, 802 F.Supp. 424, 433 (S.D.Ala.1992), found that "the contents of [recovery] plans are discretionary." While it is true that § 4(f) "does not permit an agency unbridled discretion," and "imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible," *Fund for Animals v. Babbitt*,

---

**18.** I am also persuaded, therefore, that there are no stringent time requirements for revising a recovery plan. The plaintiff argues, nevertheless, that NMFS itself determined that the Recovery Plan should be revised every three years for the first fifteen years and every five years thereafter. At oral argument, plaintiff argued that such revision was, therefore, nondiscretionary. The relevant language in the Recovery Plan states that "[t]hree-year intervals [for updating the Plan] are recommended." Right whale Recovery Plan, Ettinger Aff., Exh. 14, at 13. This is clearly the language of discretion. Moreover, inasmuch as 16 U.S.C. § 1533(f) requires NMFS to report to

Congress "on the status of efforts to develop and implement recovery plans," the defendants represented at oral argument that the 1996 report was forthcoming. Considering these factors, I find the plaintiff's allegation with respect to revision to be meritless.

**19.** The plaintiff includes Minke whales in his list. Minke whales, however, are not listed as an endangered or threatened species under the ESA. *See Strahan v. Coxe*, 939 F.Supp. 963, 969 (D.Mass.1996).

903 F.Supp. 96, 107 (D.D.C.1995), the requirement does not mean that the agency can be forced to include specific measures in its recovery plan. In fact, all that is required in a recovery plan is "the identification of management actions necessary to achieve the Plan's goals for the conservation and survival of the species." *Id.* at 108.

In any event, the evidence does not support that the measures suggested by the plaintiff are "necessary to achieve the plan's goal for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i). And in fact, some of the measures advocated by the plaintiff are currently being implemented by NMFS. For example, the plaintiff's expert, Robert D. Stevenson, Ph.D., states that NMFS should conduct a population viability analysis ("PVA") to "provide a basis on which to prioritize conservation efforts." Stevenson Aff. ¶ 3b. In his affidavit, Stevenson also describes the process by which a PVA should be implemented. *See id.* Philip Michael Payne, NMFS's Recovery Plan Coordinator until April, 1996, states that NMFS is currently funding a project recommended by Dr. Caswell of the Woods Hole Oceanographic Institute, that incorporates many of Stevenson's suggestions. *See* Payne Dec. at 16–18. To be sure, it appears the NMFS research does not fully adopt Stevenson's suggestions. In this connection, Payne states that "NMFS has…analyzed the possibility of doing a PVA analysis for the species but determined that such an exercise would not be useful." *Id.* at 17. And with respect to the annual census recom-

mended by Stevenson, *see* Stevenson Aff. ¶ 3a, Payne asserts that:

> [s]etting aside for the moment whether such annual surveys are even possible, [experts] have shown that detecting a baseline using idenpendent [sic] counts over time in a small population is difficult and they recommend against basing management on such an approach…. In other words, we would only detect that the population [of Right whales] was declining when it reaches a size of 42 animals, which clearly is not acceptable. Therefore, even if rights whale surveys are done every year, they will not succeed in adequately monitoring the population….
>
> It will likely be far better to put resources into the photo-id analyses, rather than into aerial or ship surveys.

Payne Dec., at 14–15. Experts in the field plainly have different opinions as to what measures should be taken most effectively to promote conservation efforts for Right whales. It is also plain, however, specifically from the Payne Declaration, that NMFS has considered the alternatives suggested by the plaintiff.[20] The fact that NMFS did not adopt precisely the recommended measures in its recovery plan, does not make that plan deficient. Indeed, especially when expert, scientific judgments are involved, the court must afford the agency's decision a great deal of deference. *Bays' Legal Fund v. Browner*, 828 F.Supp. 102, 107 (D.Mass. 1993).[21]

---

20. I do not find compelling plaintiff's assertion that whale-ship interaction modeling is necessary for the plan to comply with the ESA's requirements. The plaintiff has asserted this contention with respect to the Biological Opinion, the Biological Assessment, and the Environmental Impact Statement, citing *Roosevelt Campobello*, 684 F.2d at 1052–53, in each instance. In that case, however, the court found that such modeling was necessary after the "EPA, the State of Maine, and the Coast Guard all [found such modeling] as being necessary to a final determination of safety." *Id.* at 1052. Quite the contrary, in this litigation, no party (or non-party) has testified (through more than conclusory statements) that such modeling is necessary or would even materially benefit the endangered whales.

21. Although it is not appropriate for the Court to engage in scientific evaluation, I note, however,

that Dr. Stevenson's recommendations continue to deserve NMFS's serious and thoughtful consideration. I find particularly compelling Dr. Stevenson's suggestions regarding "a statistically-designed plan to monitor populations [sic] levels and trends." Stevenson Supp. Aff. ¶ 6. NMFS would be well advised to consider Dr. Stevenson's proposals, as well as the proposals of other qualified experts, especially in light of the fact that NMFS, itself, intended the Recovery Plan to be revised in three-to-five year intervals. *See* Right whale Recovery Plan, Ettinger Aff., Exh. 14, at 13. It would appear appropriate to include in the revision process a re-evaluation of the current methodologies employed in studying Right whales. I reemphasize, however, that it is not for the court to make such determinations.

Last, I find that the recovery plan does contain "objective, measurable criteria," § 4(f)(1)(B)(ii), and "a description of site-specific management actions," § 4(f)(1)(B)(i). In terms of "objective, measurable criteria," the recovery plan states that the recovery goal is 7000 animals. *See* Final Recovery Plan for the Northern Right Whale, at 13. (CG AR VIA, Doc. 163.) The plaintiff argues that this goal is unrealistic and meaningless without a provision for interim goals. I find nothing in § 4(f) that mandates such interim goals.[22] I also find that the Recovery Plan satisfies the "site-specific" requirement. The term "site-specific" has been interpreted to refer to geographical areas, requiring that the agency "in designing management actions, consider the distinct needs of separate ecosystems or recovery zones occupied by a threatened or endangered species." *Fund for Animals,* 903 F.Supp. at 106. The Recovery Plan meets this requirement because it considers the separate needs of the northern Atlantic population and the northern Pacific population. *See* Recovery Plan, Chapter III, Chapter IV. Additionally, the plan also addresses the different habitats of Northern Right whales at different times of year and contains measures specifically directed at each habitat. *See id.* at 5–7, 17–18. I find that the Recovery Plan is not arbitrary and capricious.

The plaintiff argues that even if the Recovery Plan is not arbitrary and capricious, NMFS has still violated the ESA because it has not implemented the plan. To support this contention, the plaintiff lists (and has charted, *see* Pl's Exh. I), certain goals limned in the Recovery Plan that are not yet in effect. While it appears that some of the Recovery Plan's goals have not been implemented, *e.g.,* "appropriate seasonal or geographic regulations for the use of certain fishing gear in" the Bay of Fundy and the Southern Nova Scotia Shelf, I find plaintiff's allegations to be largely unfounded and needlessly technical. For example, the plaintiff states that no regulations on whale-watch vessels exist today. *See* Pl's Opp., at 18. In February, 1997, however, NMFS issued a rule restricting *all* vessels and aircraft from approaching Right whales at a distance closer than 500 yards. Moreover, while the plaintiff asserts that "NMFS still has not located the unknown wintering area it alleges exists," Pl's Opp., at 17, Philip Michael Payne avers that the research enabling NMFS to "find the unknown summer nursery and wintering grounds" is ongoing. Payne Dec., at 22–23. *See also* Deposition of Douglas W. Beach, at 199. (Ettinger Aff., Exh. 71.) After considering these efforts, I find that NMFS is taking steps to implement its Recovery Plan and that no ESA violation exists. I will grant summary judgment for the defendants on Count XIII.[23]

**3. The Takings Claims**

In Count IX, the plaintiff alleges that the Coast Guard has violated § 9 of the ESA which prohibits any person from "taking" a listed species. 16 U.S.C. § 1538(a)(1)(B). Count X alleges the same violation under the analogous provisions of the MMPA, 16 U.S.C. § 1372(a)(1). The plaintiff's "takings" claims are divided into "takings" by Coast Guard vessels and "takings" by non-Coast Guard vessels to whom the Coast Guard has issued Certificates of Documentation.

**A. Coast Guard Vessels**

The statute defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect. . . ." 16 U.S.C.

---

22. In any event, the Recovery Plan does contain interim goals. *See* Recovery Plan, at 14. The plaintiffs argue, however, that like its final goal, the Plan's interim goal—of downgrading the Right whale from endangered to threatened—is unreasonable and unrealistic because the population will have to reach a level of 6000 whales.

23. In their Answer to the Amended Complaint, the defendants state that "a recovery plan prepared under section 4(f) of the ESA . . . is synonymous with and fulfills the requirement for a conservation plan under section 115(b) of the MMPA." Answer ¶ 114. The plaintiff does not dispute this assertion. Because I find that NMFS has prepared and implemented adequate recovery plans, I will also grant summary judgment for the defendants on Count XIV which alleges that NMFS has failed to prepare conservation plans for the federally protected whales as required under section 115 of the MMPA, 16 U.S.C. § 1383b(b).

§ 1532(19). There is no dispute that Coast Guard vessels have "taken" two Right whales and one Humpback whale in the last seven years.[24] The relief the plaintiff seeks as a result of these determinations, however, has not been shown to be necessary or supportable. In his Prayer for Relief, the plaintiff requests that this Court issue a declaratory judgment "that taking of Federally Protected Whales by the Coast Guard in the course of their operation of vessels on the marine waters of The [sic] United States without any 'small take permit' to do so . . . constitutes an illegal taking of the Northern Right whale and other Federally Protected Whales and is in violation of the prohibitions of the MMPA." Am. Complaint, Prayer for Relief ¶ 5. Given the admissions of the defendants, such a declaration would be supererogatory.

 The plaintiff also requests specific, injunctive relief that will prevent future takings.[25] The standard applied by the First Circuit to determine whether a court should grant injunctive relief is whether "petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species." *American Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir.1993). *See also Strahan v. Coxe*, 939 F.Supp. at 986. Accordingly, I will consider the likelihood of future takings, using as evidence, *inter alia*, the three takings to which the Coast Guard admits. It is clear, and the defendants admit, that if the Coast Guard's conduct that resulted in the three takings were to contin-

ue, the evidence would be sufficient to meet the First Circuit's standard. The defendants assert, however, that "none of those takes occurred with the present whale protection programs in place." Dft's Opp., at 15. They further argue that NMFS, in its 1996 Biological Opinion, determined that adoption of the APLMR is likely to prevent the Coast Guard from taking any more whales. *See id.*

The plaintiff, by contrast, claims that the defendants' new procedures "are mere window dressing which are unlikely to stop the killings." Pl's Reply, at 10. Accordingly, an examination of the Reasonable and Prudent Alternatives suggested in the 1996 Biological Opinion is warranted. Briefly, the RPA instructed that: (1) "All conservation recommendations from the September 1995 biological opinion that concern endangered whales must be implemented. . . . Progress on the actual effects of implementation must be determined, and a report provided to NMFS annually beginning with the first report due January 1, 1997. . . ."; (2) "The Coast Guard must post dedicated lookouts during all transits . . . in all areas of whale concentrations and high use by right whales . . . "; (3) "The Coast Guard must make sure that all dedicated lookouts have successfully completed the marine mammal training program . . . . "; (4) The relevant areas must "provide support for aerial surveys during periods of high use . . . . "; (5) "all District guidance documents must be revised to clearly require use of the 'slow safe speed standard . . . . "; (6) "the

---

**24.** It is undisputed that in 1991, the Cutter *Chase* struck and killed a Right whale calf and in 1993, the Cutter *Point Francis* ran through a group of Right whales, killing another calf. It is also undisputed that in 1995, the Coast Guard Cutter *Reliance* struck a Humpback whale. Although there was no evidence that the Humpback whale was killed or permanently injured, such evidence is not required to constitute a "take." *Cf. Strahan v. Coxe*, 939 F.Supp. 963, 983 (D.Mass.1996) ("The term 'take' is to be construed liberally. . . . It should be defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife.") (internal quotations and citations omitted).

**25.** Specifically, the plaintiff requests the Court to impose (1) a 500 yard distance rule for the Northern Right whales and a 100 yard distance rule for all other Federally Protected Whales; (2)

a 5 knot speed limit at night and times of poor visibility in critical habitat areas and other areas where Federally protected whales are likely to be; (3) a program of regular surveillance of critical habitat areas to determine the presence or absence of Federally Protected Whales; (4) a commitment to enforcement of the ESA and the MMPA; and (5) regulation of activities which may endanger Federally Protected Whales in critical habitat areas or "refrain from issuing any permit under any federal statute to operate a vessel off the United States coastline." Am. Complaint, Prayer for Relief ¶ 13(1)–(5). At oral argument the plaintiff elaborated on these requests specifying that the Right whale Recovery Plan should be revised, that critical habitat areas should be expanded, that NMFS must timely issue its annual stock assessments, and that consultation should be reinitiated.

Coast Guard must participate in investigating, testing and implementing technological solutions to prevent vessel strikes .... "; (7) "the Coast Guard will adopt a policy during non-emergency operations of not approaching whales head-on and not approaching right whales within 500 yards and all other whales within 100 yards.... "; (8) "The Coast Guard must provide information to commercial and recreational vessel operators that is geared to avoiding collisions with endangered whales.... "; (9) "The Coast Guard must ... provide timely information on current locations of all endangered whales to commercial vessels.... "; (10) "The Coast Guard must notify NMFS of any event that will take place in critical habitat and in areas of high-use or concentration for all listed species including right whales."; (11) "[T]he Coast Guard shall work in conjunction with other agencies to designate critical habitat and high-use areas as Particularly Sensitive Areas.... ". *Id.* at 26–29.[26] These recommendations cover most of the substance that Strahan requests in his Prayer for Relief.[27]

■ It is important to note, at this juncture, that the ESA's requirements are stringent and unyielding. *See TVA v. Hill,* 437 U.S. 153, 173–74, 98 S.Ct. 2279, 2291–92, 57 L.Ed.2d 117 (1978). Indeed, "examination of the language, history, and structure of the legislation ... indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174, 98 S.Ct. at 2292. Moreover, "it is clear Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing pro-

jects in order to fulfill the goals of the Act." *Id.* at 186, 98 S.Ct. at 2298. With respect to the conservation of the Northern right whale, therefore, the ESA's requirement that a federal agency "insure that any action ... is not likely to jeopardize the continued existence of any endangered species or threatened species ..." 16 U.S.C. § 1536(a)(2), if most strictly interpreted, could require the Coast Guard to cease all operations along the Atlantic Coast. Such an order would not be appropriate. Indeed, the plaintiff himself does not request such drastic measures. The question becomes, then, a matter of calibration—how many protective measures are enough to satisfy the ESA? At this point on this record, I find that the measures suggested in the 1996 Biological Opinion sufficiently decrease the likelihood the future takings of Right whales to justify a determination that plaintiff cannot establish that the Coast Guard's activities under the APLMR regime will, if continued, "actually harm" Right whales. *Bhatti,* 9 F.3d at 166.[28] More specifically, I find that, if implemented, the protective measures in the APLMR and the 1996 Biological Opinion will insure, to the same extent as the measures proposed by Strahan, that future takings will not occur. Accordingly, I find that plaintiff has not supported a case for further injunctive relief.

### B. Non–Coast Guard Vessels

■ The plaintiff also argues that the Coast Guard should be liable for "takings" by non-Coast Guard vessels to whom it has issued a Certificate of Documentation. As I

---

**26.** These provisions, of course, include greater detail and subtleties in the 1996 Biological Opinions. For the sake of brevity, however, I included only the central point of each directive.

**27.** The only measure not included is the imposition of a 5 knot speed limit at night and at times of poor visibility. NMFS's adoption and implementation, however, of the "slow safe speed" standard has been interpreted to mean that "if necessary, [vessels should] reduce speed to the minimum at which the vessel can be kept on course or come to all stop." FEIS, App. T. Moreover, NMFS explained, in the 1996 Biological Opinion, that a 5 knot speed limit was not reasonable because many Coast Guard vessels cannot maintain headway at that speed. *See* FEIS at 3–7. It was argued, quite compellingly, at oral argument that the Coast Guard should

have imposed the 5 knot speed limit on vessels that could operate at that speed. The Court agrees that this would be a better rule than the universal "slow, safe speed" requirement. Nevertheless, it is not the Court's job to substitute its judgment for the Coast Guard's, but rather to determine whether the Coast Guard's adoption of the "slow, safe speed" requirement was arbitrary and capricious. I do not find that it was.

**28.** I do not find that the plaintiff's allegations concerning the inefficacy of the Coast Guard's Early Warning System warrant the conclusion that future takings are likely. *See* Pl's Memo, at 36–37. Moreover, the circumstances presented by the plaintiff's anecdotal evidence are now explicitly prohibited by NMFS's approach rule. *See* 62 Fed.Reg. 6279 (Feb. 13, 1997).

previously have determined, the Coast Guard's issuance of Certificates of Documentation is not discretionary and so does not trigger the ESA. *See Strahan v. Linnon,* CA No. 94–11128–DPW, Memorandum and Order, May 2, 1995, *infra* at 621. Accordingly, the plaintiff's theory of liability cannot stand.

I will grant summary judgment for the defendants as to Counts IX and X.

## IV. NEPA

In Count IV of the Amended Complaint, the plaintiff alleges that the Coast Guard "has not complied with the non-discretionary duties imposed on it by NEPA." (Amended Complaint ¶ 66.) Specifically, the plaintiff argues that the Final Environmental Impact Statement ("FEIS") failed to consider the environmental impact of its proposed actions, failed to assess the cumulative impact of its actions on the environment and failed adequately to evaluate alternatives to its proposed solution.

■ The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* "declares a broad national commitment to protecting and promoting the environmental quality." *Dubois v. United States Dep't of Agriculture,* 102 F.3d 1273, 1285 (1st Cir. 1996), *petition for cert. filed,* 65 USLW 3675 (U.S. Mar. 28, 1997) (No. 96–1539) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 1844–45, 104 L.Ed.2d 351 (1989)). Under NEPA, an agency considering any action that will have a significant impact on the environment must prepare an Environmental Impact Statement ("EIS") " ' [t]o ensure that this commitment is infused into the ongoing programs and actions of the Federal Government.' " *Id.* (quoting *Robertson,* 490 U.S. at 348, 109 S.Ct. at 1844–45). The EIS must be a "detailed statement" including, *inter alia,* a discussion of the environmental impact of and the alternatives to the proposed project. *See* 42 U.S.C. § 4332(C). "These duties are essentially procedural." *Roosevelt Campobello International Park Commission v. U.S.E.P.A.,* 684 F.2d 1041, 1045 (1st Cir. 1982) (internal quotations omitted). The EIS, therefore, "helps satisfy NEPA's 'twin aims': to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action, and to make information on the environmental consequences available to the public." *Dubois,* 102 F.3d at 1285 (citing *Robertson,* 490 U.S. at 350, 109 S.Ct. at 1845–46).

### A. Reasonable Alternatives

■ The Council on Environmental Quality ("CEQ") regulations state that the consideration of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. Moreover, the regulations require that the EIS "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.* § 1502.14(a). The plaintiff asserts that the FEIS fails to discuss adequately the possible alternatives to the proposed project. Specifically, the plaintiff argues that the FEIS discusses only two alternatives: "the 'no action alternative' and the APLMR Initiative." (Pl's Memo, at 19.) "In essence," the plaintiff alleges, "the FEIS analyzed whether to implement some mitigation measures or none; however, it fails to provide the analysis or information necessary to decide which mitigation measures should be implemented." (*Id.*) According to the plaintiff, therefore, the FEIS is fatally flawed. An examination of the FEIS reveals that both the plaintiff's premise and his conclusion are incorrect.

■ The Coast Guard's duty under NEPA "is to study all alternatives that 'appear reasonable and appropriate for study at the time' of drafting the EIS, as well as 'significant alternatives' suggested by other agencies or the public during the comment period." *Roosevelt Campobello,* 684 F.2d at 1047 (citing *Seacoast Anti–Pollution League v. NRC,* 598 F.2d 1221, 1228–33 (1st Cir. 1979)). The range of reasonable alternatives is "dictated by the nature and scope of the proposed action." *City of Carmel–By–The–Sea v. United States Dep't of Transportation,* 95 F.3d 892, 903 (9th Cir.1996) (quoting *Alaska Wilderness Recreation v. Morrison,* 67 F.3d 723, 729 (9th Cir.1995)). Additionally, "[a]n agency's consideration of alternatives is adequate 'if it considers an appropriate range

of alternatives, even if it does not consider every available alternative.'" *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir.1994) (quoting *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180–81 (9th Cir.1990)). I find that the Coast Guard's discussion of alternatives in the FEIS is adequate.

First, the FEIS demonstrates a detailed comparison of the "No Action Alternative" and the "Preferred Alternative," evaluating factors such as the potential impact on the physical, biological and socioeconomic environments. *See* FEIS at 3–18–3–24. If this detailed account were the only discussion of alternatives, I might agree with the plaintiff that the FEIS is insufficient. The FEIS's discussion of alternatives, however, is not limited to this comparison. For example, the FEIS also briefly evaluates and explains its reasons for rejecting recommendations such as "the USCG ceasing to conduct all marine activity in coastal and offshore waters," "conducting *all* USCG vessel operations at slow speed and operating *all* aircraft at higher altitudes," "avoiding all critical habitats ... during times when the protected species are likely to be present." *See id.* at 3–17–3–18. Additionally, the FEIS discusses the rejected possibility of adopting "variations of the proposed action." *Id.* at 3–16. Moreover, the FEIS also addresses specific comments that were received during the comment period for the Draft Environmental Impact Statement. *See id.* at 3–12–3–14; FEIS, Appendix Q.[29]

Under the rule of reason typically applied by courts "in determining whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences[,]" *Dubois*, 102 F.3d at 1287, I find that the FEIS's discussion of alternatives to the proposed action withstands scrutiny. I note that "as long as the [Coast Guard] 's decision is fully informed and well-considered, it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment." *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988) (quoting *North Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C.Cir.1980)). I find that the discussion of alternatives, combined with the detailed response to comments is sufficient to trigger such judicial deference. *Cf. id.* at 297 ("We are satisfied ... [with] ... the Secretary's coverage of conservation ... although the FEIS and NEPP themselves deal with the matter in general terms and do not provide petitioners with detailed responses to their comments."); *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir.1990) ("We believe ... that the Service's failure seriously to consider any alternative ... raises serious questions of compliance with applicable law.") I also note that because the nature of the proposed action does not have a self-limiting range of potential alternatives, it would be an unwarranted burden to hold the agency responsible for analyzing every possible alternative. *Cf. Dubois*, 102 F.3d at 1289, 46 Fed.Reg. 18026, 18027 (1981). I find the discussion of alternatives sufficient.

**B. Cumulative Impacts**

The plaintiff also faults the FEIS for not discussing adequately the cumulative im-

---

**29.** I note that "[e]ven the existence of supportive studies and memoranda contained in the administrative record but not incorporated in the EIS cannot 'bring into compliance with NEPA an EIS that by itself is inadequate.'" *Dubois*, 102 F.3d at 1287 (quoting *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir.1980)). Nevertheless, the public comments are published and indexed with the FEIS, together with the Coast Guard's response and are "integral parts" of the FEIS. *Tongass Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1143 n. 5 (D.C.Cir.1991) (citing *Sierra Club v. Adams*, 578 F.2d 389, 394 (D.C.Cir.1978)). Accordingly, this admonition is inapposite in the present context. In any event, the main text of the FEIS addresses all but one of the alternatives suggested in the plaintiff's Memorandum at 19 n. 27. Specifically, the FEIS evaluates the imposition of numerical speed limits on Coast Guard vessels (FEIS at 3–6–3–7), the imposition of numerical speed limits, distance limits and other requirements for non-Coast Guard vessels (*id.* at 3–14–3–15), and use of specific enforcement measures to protect endangered whales. (*Id.* at 3–5. 3–14–3–15, 5–16–5–17.) I note that the plaintiff's suggestion not addressed by the Coast Guard was apparently not raised by the plaintiff until the present time, *after* the administrative process has been completed. The plaintiff may not now suggest that the FEIS should be found invalid for not including a discussion of an alternative as to which he failed to do more to bring the matter to the agency's attention. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553–54, 98 S.Ct. 1197, 1216–17, 55 L.Ed.2d 460 (1978).

pact of the proposed action. Specifically, the plaintiff contends that "[r]ather than analyzing the effects of its operations and the cumulative effects of operations of non-Coast Guard vessels," the FEIS "evaluated [only] the cumulative impact of the already-selected mitigation program itself." (Pl's Memo, at 22) (internal quotations and citations omitted). I find this contention to be without merit.

NEPA requires that an EIS contain an analysis of its own environmental consequences "when added to other past, present and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. I find that the FEIS adequately addresses the cumulative effects of its proposed action and the actions of non-Coast Guard vessels. Indeed, the FEIS compares the cumulative impact of the "No Action Alternative" and the "Preferred Alternative," when no such comparison is required. In its discussion of the cumulative impact of the "No Action Alternative," the FEIS gives a fairly detailed account of the number of non-Coast Guard vessels and their effect on the physical, biological and socioeconomic environment along the United States Atlantic Coast. *See* FEIS at 5–18–5–23. The same detailed analysis is repeated during the discussion of the "Preferred Alternative." *See id.* at 5–31–5–33. Additionally, an extremely detailed discussion of the presence and effects of fishing and whale-watch vessels is also included in the FEIS. *See id.* at 4–81–4–91. I find that these discussions amount to more than "perfunctory references [that] do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts." *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 299 (D.C.Cir.1988).[30] Again under a rule of reason standard, I "conclude that the [F]EIS contains a 'reasonably thorough discussion' of these impacts." *Re-*

*sources Limited, Inc. v. Robertson,* 35 F.3d 1300, 1306 (9th Cir.1993).

**C. Current Data**

The plaintiff also asserts that the FEIS did not rely on current data. While it is true that an environmental impact statement must be based on current data, *see Carmel–by–the–Sea,* 95 F.3d at 900, the plaintiff nowhere points to specific data relied upon in the FEIS that was outdated or inaccurate. Moreover, inasmuch as the FEIS relied on data from the Biological Assessment and the 1995 and 1996 Biological Opinions, I find that the data in those documents is sufficiently current to satisfy NEPA's requirement that the agency take "a 'hard look' at the environmental consequences of its proposed action." *Dubois,* 102 F.3d at 1285. I find that the Coast Guard took a hard look at the consequences its activities have on Right whales and that the FEIS was not arbitrary or capricious. *Id.* at 1289. Accordingly, I grant summary judgment for the defendants on Count IV.

**V. Miscellaneous**

**A. Non-Enforcement**

The plaintiff and defendants also move for summary judgment on Counts XXI and XXII which allege that the Commerce Defendants have violated Section 107 of the MMPA, 16 U.S.C. § 1377, and Section 11 of the ESA, 16 U.S.C. § 1540, because they have failed to enforce the relevant provisions of those statutes. I find that this allegation is wholly without merit and I will grant summary judgment for the defendants.

Even the plaintiff concedes the general proposition that as to decisions of an agency not to take enforcement steps "the presumption is that judicial review is not available." *Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Accordingly, plaintiff attempts to ob-

---

**30.** I do note that the discussions of cumulative impact do not reference scientific studies or other materials that would enable a decisionmaker to have easy access to the information underlying the secretary's findings and conclusions. *Cf. id.* at 300. While this sort of precision is preferred, it is not required and the FEIS should not be

found wanting because it is lacking. Moreover, "the bottom line is that the relevant agenc[y] conducted an analysis of the environmental impact [of the cumulative effects]." *Conservation Law Foundation v. Federal Highway Administration,* 24 F.3d 1465, 1474 (1st Cir.1994).

tain judicial review by arguing that the agency has "consciously and expressly adopted a general policy [of nonenforcement] which is in effect an abdication of its statutory duty." *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C.Cir.1973) (en banc).[31] This abdication argument fails. First, despite the plaintiff's anecdotal evidence,[32] I find that the record here does not demonstrate that NMFS has adopted a policy of non-enforcement. To the contrary, the record demonstrates that NMFS does enforce the ESA and the MMPA with some degree of vigor. For example, "[s]ince 1990, NMFS has opened approximately 427 investigations of alleged violations of the ESA and MMPA in the Northeastern United States. Of these 427 investigations, NMFS or NOAA issued 60 Notices of Violations and Assessment ('NOVAs'), sought approximately 97 property forfeitures, issued about 92 written warnings, and offered approximately 17 summary settlements. . . . The remaining investigations were either dismissed or are still pending." Declaration of David A. McKinney ¶ 5 (Dft's Motion in Support of Summary Judgment, Exh. C.) Such evidence of enforcement precludes any claim of abdication. *See e.g., Cutler v. Hayes*, 549 F.Supp. 1341, 1347 (D.D.C.1982), *aff'd in part, vacated in part*, 818 F.2d 879 (D.C.Cir. 1987) (affidavit of the acting director of the FDA stating that FDA had taken enforcement actions, listing seventeen examples in ten years demonstrates that "the FDA has

not adopted a policy of total non-enforcement.").

▮▮▮▮▮▮ Moreover, in order to maintain a "failure to enforce claim" under the Administrative Procedure Act, there must be no adequate alternative remedy. *See Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C.Cir.1990). Here, section 11 of the ESA provides the plaintiff with opportunity to sue a non-federal party directly for an alleged violation of the take prohibitions. 16 U.S.C. § 1540(g)(1). Although the plaintiff asserts that direct lawsuits against individual violators would be difficult, that circumstance does not defeat the policy that "situation-specific litigation affords an adequate, even if imperfect, remedy." *Id. See also Washington Legal Foundation v. Alexander*, 984 F.2d 483, 485 (D.C.Cir.1993). I will grant the defendants' motion for summary judgment on Counts XXI and XXII.

### B. Cooperative Agreement

▮▮▮▮ Count XXIII of the Amended Complaint alleges that NMFS has violated Section 6 of the ESA, 16 U.S.C. § 1535 by entering into a Cooperative Agreement with the Commonwealth of Massachusetts because the Commonwealth does not have "an adequate conservation program for the Northern Right whale and other Federally Protected Whales" and "Massachusetts does not have plans for 'immediate attention' to be given to

31. I note that while the presumption against reviewability announced in *Heckler v. Chaney* is subject to rebuttal, *e.g.*, through a demonstration that the statute provides standards by which a court could evaluate the agency's conduct, *see Heckler*, 470 U.S. at 834, 105 S.Ct. at 1657. The plaintiff has not attempted to demonstrate that such standards exist. Even if the plaintiff did attempt to distinguish the ESA and the MMPA on these grounds, however, the attempt would fail because those statutes do not contain the detailed language necessary to remove the enforcement decision from absolute prosecutorial discretion. *Cf. id.* at 834–35, 105 S.Ct. at 1657 (comparing the language of the LMRDA which indicated that the Secretary was required to file suit if certain "clearly defined" factors were present with the more general language of the FDCA providing that the "Secretary is authorized . . .").

32. The plaintiff cites three examples of incidents he claims demonstrate NMFS's policy of non-enforcement. For example the plaintiff's Memo-

randum recounts that in 1992 an individual reported witnessing a whale watch vessel harassing a Fin Whale but that the Coast Guard report indicates no further investigation and that the complaint was dismissed. *See* Pl's Memo, at 31. The plaintiff also represents that in 1994 "[n]ine individuals who had been on a whale watch signed a written statement reporting that another boat . . . 'charged full speed towards the whale and brought its hull within 10 feet.' " *Id.* Plaintiff then alleges that after a perfunctory investigation, the Coast Guard concluded that "[u]nless further information is developed no further investigation is warranted." *Id.* at 32. The last incident cited by the plaintiff is that NMFS failed to impose sanctions on a sport fishing vessel that accidentally struck a Humpback Whale. *Id.* While these reports demonstrate that the Coast Guard does not investigate every alleged incident to a degree that would satisfy the plaintiff, three examples of less than zealous enforcement do not a policy of non-enforcement make.

provide adequate protection to the Federally Protected Whales." (Amended Complaint ¶¶ 170a-b.) I find the plaintiff's allegations to be meritless.

Specifically, the plaintiff contends that the Cooperative Agreement violates the ESA because Massachusetts does not have "an established acceptable conservation program." 16 U.S.C. § 1535(c)(1)(B). In related litigation, I have been addressing on an interlocutory basis the Commonwealth's responsibilities regarding the Northern Right whale and have determined that the Commonwealth needed some encouragement to develop its policies in this area under the ESA. *See generally Strahan v. Coxe*, 939 F.Supp. 963 (D.Mass.1996). The ESA does not require, however, that Massachusetts have a satisfactory conservation plan in order to enter into a cooperative agreement with NMFS. In fact, all that is required is that the state have plans "under which immediate attention will be given to those resident species of fish and wildlife which are determined by the Secretary or the State agency to be endangered or threatened and which ... are most urgently in need of conservation programs." 16 U.S.C. § 1535(c)(1)(ii). The Commonwealth, under prodding from this Court—to be sure—is now engaged in a program to give immediate attention to its obligation regarding Right whales under the ESA. The Cooperative Agreement does not violate the statute.

## C. Failure to Act

■■■ Counts XVIII and XIX assert that NMFS and the Coast Guard have failed to act with respect to certain petitions filed by plaintiff Strahan regarding approach distances for federally protected whales.[33] Accordingly, the plaintiff requests that this Court "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1)(APA). I find that these claims are moot because NMFS issued an interim final

rule establishing a 500-yard buffer zone around Right whales on February 13, 1997. 62 Fed.Reg. 6729. The plaintiff asserts that this rule does not address other species of federally protected whales and so insists that NMFS has still failed to act on Strahan's petition. This assertion, however, is factually incorrect because the rule states:

> NMFS did not propose restrictions on approaches to any species except right whales. As indicated above, NMFS believes that such restrictions should be evaluated on a species—and region—specific basis, and NMFS has not completed those evaluations at this time.

*Id.* at 6733. Accordingly, NMFS acted on Strahan's petition by accepting his recommendations as to Right whales and rejecting for the time being his recommendations with respect to all other species. That NMFS did not act in a way that the plaintiffs find acceptable, does not constitute a failure to act. I also find that the Coast Guard acted, through its Record of Decision, issued on December 9, 1996 which stated that NMFS was the appropriate agency to issue the requested regulations and that it would defer to NMFS. *See* Record of Decision ¶ 2 (Docket No. 161.) Again, an unfavorable decision is not the same as no decision at all.

■■■ At oral argument, the plaintiff intimated that he was also challenging the merits of the interim final rule as issued. The defendants contest the legitimacy of such a substantive attack claiming that the pleadings cannot be stretched to cover such a claim. Although I have interpreted the pleading and jurisdictional requirements generously elsewhere in this Memorandum and Order, I find that the line must be drawn in this instance. Counts XVIII and XIX do not even mention the merits of NMFS's February 13, 1997 interim final rule. They merely allege a failure to act on Strahan's petitions. Such allegations do not provide a basis for a substantive attack. Accordingly, I find that

---

**33.** There is some dispute regarding the timing of Strahan's petitions. For example, the plaintiffs assert that Strahan "petitioned in 1992 for NMFS to promulgate distance rules." Pl's Opp., at 22. I note that while the plaintiffs cite their Statement of Facts ¶ 110 in support of this contention, that paragraph (and the surrounding paragraphs) does not support this statement. Moreover, the defendants assert that they did not receive any petition from Plaintiff Strahan in 1992 although they concede receiving such a petition on or about October 5, 1994. *See* Dft's Reply, at 18. In any event, this dispute is not material.

such an attack is inappropriate at this juncture. I will, therefore, grant summary judgment to the defendants on Counts XVIII and XIX.

### D. 50 C.F.R. § 402.03

In Count XX, the plaintiff asserts a facial challenge to the validity of 50 C.F.R. § 402.03 which states that "Section 7 [of the E.S.A.] and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control," alleging that it is inconsistent with the "plain language" of the ESA which mandates that "[e]ach Federal Agency shall, in consultation with and with the assistance of the Secretary, insure that *any* action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species.... " 16 U.S.C. § 1536(a)(2). The plaintiff argues that because the regulation and the statute are inconsistent, the regulation is beyond the agency's authority. *See United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). This claim must fail for several reasons.

■ First, the defendants are correct that the statute of limitations for challenging the regulation has expired. The statute of limitations governing actions against the United States requires that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). The regulation in question was promulgated on June 3, 1986. 51 Fed.Reg. 19957. The plaintiff argues that this statute of limitations does not apply to "agency promulgated regulations of continuing application." Pl's Opp., at 22. I do not find, however, the plaintiff's argument persuasive on this point as a matter of logic. Moreover, the case law he cites does little to help his position. For example, in *Wind River Mining Corp. v. United States,* 946 F.2d 710, 715 (9th Cir.1991), the court determined that "if the person wishes to bring a policy-based facial challenge to the govern-

ment's decision, that [ ] must be brought within six years of the decision." I find that the plaintiff's challenge to 50 C.F.R. § 402.03 is such a "policy–based" facial challenge in that his claim is that the regulation is plainly inconsistent with Congress' mandate in the ESA. Accordingly, the "grounds for such [a] challenge[ ] [should have been] apparent to any interested citizen within a six-year period following the promulgation of the [regulation]." *Id. Wind River Mining* excuses litigants from the six-year requirement only when the challenger "file[s] a complaint for review of the *adverse application* of the [regulation] to the particular challenger." *Id.* (emphasis added). That exception does not apply to the plaintiff.[34]

■ Even if the statute of limitations did not bar the plaintiff's challenge to this regulation, I find the plaintiff's construction of § 7(a)(2) troubling in that it gives too broad a definition to the meaning of "agency action" in that statute. Indeed, I find that the consultation requirement applies only to discretionary actions because, as I stated in my May 2, 1995 Memorandum and Order, "[i]f the federal agency has no discretion to modify the activity at issue to accommodate the mandate of the ESA, then the consultation process would be pointless." *Strahan v. Linnon,* CA No. 94–11128–DPW, Memorandum and Order, May 2, 1995, *infra* at 621. This interpretation was also adopted by the Ninth Circuit in *Sierra Club v. Babbitt,* 65 F.3d 1502, 1504–05 (9th Cir.1995). In *Sierra Club,* the court stated "[i]n light of the statute's plain language ... we conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species." *Id.* at 1509. I also note that the agency interpretation must, in any event, be afforded substantial deference and the courts "[are] reluctant to substitute our views of wise policy for his." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* — U.S. ——, ——, 115 S.Ct. 2407, 2418, 132 L.Ed.2d 597 (1995).

---

**34.** I also note that while *Commonwealth Edison Co. v. United States Nuclear Regulatory Commission,* 830 F.2d 610, 615 (7th Cir.1987) does not even address § 2401(a), it nonetheless also states that the statute of limitations may be ignored when challenging the application of an agency regulation.

Accordingly, if required to reach the issue, I would find that 50 C.F.R. § 402.03 is not inconsistent with the ESA and is therefore not invalid. I will grant summary judgment to the defendants on this issue.[35]

## VI. Conclusion

For the reasons stated more fully above, I GRANT summary judgment to the defendants in the entirety and I DENY partial summary judgment to the plaintiff. This, of course, does not constitute endorsement of defendants' belated compliance with the ESA, the MMPA, and NEPA. They have had to be cajoled by case management initiatives of this Court to participate in the procedures mandated by those statutes.[36] But they have now done so and there is no further role for the Court at this time.

It bears emphasizing, as well, that I act only as to the claims alleged on the present record. While on this record I find that the defendants' APLMR Initiative reduces the risk of harm to endangered marine mammals sufficiently that no showing of actual harm to the species in the future has been made, the defendants must remain vigilant in their protection of the species. The Congressional mandate, as expressed by the Supreme Court in *TVA v. Hill*, 437 U.S. at 180, 98 S.Ct. at 2294–95, is clear: agencies "must use... all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which" they are no longer listed. (Internal quotations and citations omitted). That is a continuing responsibility which survives this litigation.

35. In this connection, I find inaccurate the plaintiff's suggestion that there is an exchange between the dissent and the majority in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) that is directly on point. Although the quotations cited by the plaintiff are correct, *see id.* at 173 n. 18, 205–06, 98 S.Ct. at 2291 n. 18, 2307–08, the quoted dispute is about whether the mandate to consult applies only to *prospective* actions, not *discretionary* actions.

36. I note in this connection that the plaintiff, who commenced this action *pro se*, has been ably assisted—as has the court and the proper resolution of this case—by the efforts of Jonathan Ettinger and his colleagues at the law firm of Foley Hoag & Eliot, who took on the plaintiff's representation *pro bono* following the issuance of the

## APPENDIX I

### LEXICON OF ACRONYMS

**APLMR Initiative**—Atlantic Protected Living Marine Resources Initiative; a program promulgated by NMFS and adopted by the Coast Guard as the preferred alternative to the proposed agency action.

**APA**—Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

**BA**—Biological Assessment; An analysis of the biological impacts of a proposed agency action on specified threatened or endangered species in the area of the proposed project, prepared by the agency. *See* 16 U.S.C. § 1536(c).

**BO**—Biological Opinion; An analysis of the biological impacts of proposed agency action on specified threatened or endangered species in area of proposed agency action, prepared by the Secretary. If the Biological Opinion determines that the proposed action will jeopardize the threatened or endangered species, it must propose a Reasonable and Prudent Alternative to avoid jeopardy. *See* 16 U.S.C. § 1536(b).

**Category I**—NMFS classification of fishery with highest level of incidental mortalities and serious injuries of marine mammals.

**Cooperative Agreement**—The ESA authorizes the Secretary to enter into cooperative agreements in furtherance of the Act with a state meeting certain criteria. *See* 16 U.S.C. § 1535(c).

**Conservation Plan**—Under the MMPA, the Secretary must prepare a plan with the purpose of preserving and restoring any listed

May 2, 1995 Memorandum and Order. Mr. Ettinger and his colleagues were especially valuable in effectively framing the issues. Their efforts under what were no doubt difficult and demanding circumstances appear to have had the incidental benefit of encouraging compliance by the defendants with their responsibilities *pendente lite* but also in assuring that all relevant issues were exposed for consideration. That their position did not meet with success in the summary judgment phase of these proceedings is not the proper measure of their contributions. As their equally diligent opposing counsel from the government are institutionally compelled to understand: the larger public interest is served when the process of a fair adversarial proceeding is provided by capable counsel.

stock to its optimal sustainable population. *See* 16 U.S.C. § 1383b(b)(1).

**CEQ**—Council on Environmental Quality; Council composed of three members, appointed by the President to formulate and recommend national policies to promote the quality of the environment. *See* 42 U.S.C. §§ 4342–4344. Promulgates regulations Federal agencies must follow.

**EA**—Environmental Assessment; Under the regulations, the agency must prepare an assessment of the impacts of its proposed conduct on the environment, including all the necessary information to determine whether an Environmental Impact Statement is required under NEPA.

**EIS**—Environmental Impact Statement; NEPA requires that included in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment must be a detailed report on the environmental impact of the proposed action. *See* 42 U.S.C. § 4332(C).

*DEIS*—Draft Environmental Impact Statement; Published for public review and comment on July 31, 1996.

*FEIS*—Final Environmental Impact Statement; Published on October 31, 1996.

**ESA**—Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

**FONSI**—Finding of No Significant Impact; If the agency determines, in its Environmental Assessment that the proposed action will not have serious environmental consequences, it may issue a FONSI. If a FONSI issues, no Environmental Impact Statement is required.

**MMPA**—Marine Mammal Protection Act, 16 U.S.C. § 1371 *et seq.*

**NEPA**—National Environmental Policy Act, 42 U.S.C. § 4231 *et seq.*

**NMFS**—National Marine Fisheries Service; The agency overseeing the ESA consultation process.

**Recovery Plan**—The ESA mandates that the Secretary shall develop and implement plans for the conservation and survival of endangered species, unless he finds that such a plan will not promote the conservation of the species. *See* 16 U.S.C. § 1533(f).

**RPA**—Reasonable and Prudent Alternative; If a Biological Opinion concludes that the proposed agency action will jeopardize the existence of an endangered or listed species, it must offer a Reasonable and Prudent Alternative to the proposed action that will avoid jeopardy. *See* 16 U.S.C. § 1536(b)(3)(A).

**ROD**—Record of Decision; Official record of Coast Guard's adoption of the Final Environmental Impact Statement adopting the APLMR Initiative. Published on December 9, 1996.

**Stock Assessment**—the MMPA requires that the Secretary shall report annually in the Federal Register and to Congress on the current status of all marine mammal species and population stocks that are subject to the Act.

**TRP**—Take Reduction Plan; Under the MMPA, the Secretary must develop and implement a plan designed to assist in the recovery or prevent the depletion of the listed strategic stocks of marine mammals. *See* 16 U.S.C. § 1387(f).

**TRT**—Take Reduction Team; Under the MMPA, after the Secretary has issued a stock assessment for a strategic stock of marine mammals, he may establish a team of experts in the conservation or biology of the species which the TRP will address. *See* 16 U.S.C. § 1387(f)(6).

### APPENDIX II

United States District Court
District of Massachusetts

Richard Max Strahan, Plaintiff,

v.

Rear Admiral John L. Linnon, Commander First District, United States Coast Guard and Admiral Robert E. Kramek, Commandant, United States Coast Guard, Defendants.

Civil Action No. 94–11128–DPW
*MEMORANDUM AND ORDER*

May 2, 1995

**(As Corrected May 19, 1995)**

I.

This case presents a challenge to neglect by the United States Coast Guard of its

duties under the Endangered Species Act ("ESA") and related environmental provisions. Despite ESA's mandate, the Coast Guard failed to initiate formal procedures to address the impact of its activities on various endangered marine mammals, including the Northern Right whale, until after the instant complaint was filed. The Coast Guard has not yet applied for an ESA incidental take permit or a Marine Mammal Protection Act ("MMPA") small take permit from the National Marine Fisheries Service ("NMFS"), despite the fact that at least two Northern Right whales were killed ("taken") by Coast Guard vessels in violation of the ESA and MMPA. Nor has the Coast Guard completed an environmental assessment as directed by the National Environmental Policy Act ("NEPA").

Plaintiff Richard Max Strahan, a preservationist, has alleged violations of four federal statutes: the National Environmental Policy Act and the Endangered Species Act, the Marine Mammal Protection Act, the Whaling Convention Act ("WCA"). In essence, Strahan claims that: (1) Coast Guard vessels disturb and injure the whales; (2) the Coast Guard documents and inspects many domestic marine vessels, including "whale watch" vessels, thereby allowing them to disturb and injure the whales; (3) the Coast Guard does not enforce the ESA or the MMPA; and (4) the Coast Guard has not assessed the potential impact of its activities on the environment, as required by NEPA. The defendants move for summary judgment; Strahan moves for a preliminary injunction.

Given the defendants' dilatoriness and neglect in initiating mandated procedures, I decline to grant the defendants' motion for summary judgment on the counts [1] regarding ESA consultation, conservation, and permitting (Counts I, III and IX); MMPA permitting, (Count X); and NEPA environmental assessment preparation (Count IV).

I will, however, grant the defendants' motion for summary judgment on Counts II (ESA—Certificates of Documentation and Inspection), V (ESA—whale watch vessels), VI (ESA enforcement), VII (MMPA enforcement), and VIII (WCA enforcement).

I also will grant, in part, Strahan's motion for a preliminary injunction, to the extent of directing that the Coast Guard initiate and expeditiously fulfill the procedural requirements of the ESA, MMPA, and NEPA. Because plaintiff has not made a sufficient showing that anticipated Coast Guard operations are likely to cause irreparable harm in the interim, I decline to order on an interlocutory basis that the Coast Guard modify its vessel operations in the specific manner Strahan has requested.

## II. *Background*

### A. *The Species and Their Regulatory Protection*

Strahan, an officer of GreenWorld, Inc., brings suit "on behalf of" the following species of whales: the Northern Right whale (*Eubalaena glacialis*); the Humpback Whale (*Megaptera novaenagliae*); the Fin whale (*Balaenoptera physalus*); the Sei whale (*Balaenoptera borealis*); the Blue Whale (*Balaenoptera musculus*); and the Minke whale (*Balaenoptera acutorostrata*). The first five species have been listed as endangered. (Complaint ¶ 1; Amended Ans. ¶ 1.) The complaint and submissions focus on the Northern Right whale.

Right whales are the most endangered of the large whales, despite the fact that they have been protected from commercial whaling since 1935.[2] There are only approximately 300 to 350 individual Right whales in the western North Atlantic, and the eastern North Atlantic population may be nearly extinct. 59 Fed.Reg. 28,793. Many human activities can disrupt the Right whale, including vessel activities, commercial fishing, and pollution. 59 Fed.Reg. 28,796–28,797.

Vessel activities can change whale behavior, disrupt feeding practices, disturb courtship rituals, disperse up food sources

---

**1.** I treat each "Claim for Relief" in Strahan's Complaint as a separate count.

**2.** These facts are taken from the Final Rule of the National Marine Fisheries Service designating a critical habitat for the Northern Right whale. 59

Fed.Reg. 28,793 (1994). *See also Proposed Rule: Designated Critical Habitat; Northern Right Whale,* 58 Fed.Reg. 29,186 (1993); Affidavit of Hans Neuhauser (Aug. 5, 1994).

and injure or kill whales through collisions. Thirty-two percent of the known strandings of northern right whales since 1970 have been caused by human activities.

59 Fed.Reg. 28,796 (citation omitted). More specifically, "[s]even percent of northern right whales identified have propeller scars from a large vessel," and "[m]ore than one-half of all cataloged animals have scars indicative of entanglements with fishing gear, resulting in scars, injuries, and death." 59 Fed.Reg. 28,796 (citations omitted). "Twenty-nine percent of the documented right whale mortalities have been due to ship strikes, and 11% of the right whales in the New England Aquarium photographic files have propeller scars." (Neuhauser Aff. ¶ 5.)

The Humpback and Fin whales, which Strahan also seeks to protect, are listed as endangered but are much less vulnerable than the Right whale. There are approximately 5,505 Humpback whales in the western North Atlantic. (Beach Decl. ¶ 3.) The growth rate for Humpbacks has been estimated at 9.4% during the 1980's. *Id.* There are at least several thousand Fin whales in the western North Atlantic, and the Fin whale "is considered abundant compared to other large whale species." *Id.* ¶ 4. Blue whales and Sei whales are severely depleted in population but only rarely visit the Gulf of Maine. (Beach Decl. ¶ 6 and ¶ 7.) The Minke whale is not listed as endangered or threatened, and the North Atlantic Minke whale population is estimated to be approximately 60,500 to 117,500. (Beach Decl. ¶ 8.)

On March 13, 1992, the National Marine Fisheries Service ("NMFS"), which is responsible for enforcing the Endangered Species Act, issued a final "Recovery Plan for the Northern Right Whale." 57 Fed.Reg. 8,862.

On August 3, 1992, NMFS issued a proposed rule setting a minimum approach distance of 100 yards for all whales and 50 yards for dolphins and porpoise. 57 Fed. Reg. 34,101, 34,103. This proposal was withdrawn on March 29, 1993. 58 Fed.Reg. 16,-519. On April 26, 1993, NMFS indicated that it would be issuing a final rule establishing a minimum approach distance in May of 1993, 58 Fed.Reg. 24,152, 24,155, but no such rule has yet issued. The Commonwealth of Massachusetts, however, has established a 500 yard "buffer zone" for Northern Right whales within Massachusetts waters. 322 C.M.R. § 12.00– § 12.05 (1993). On December 27, 1994, NMFS issued an advance notice of proposed milemaking to solicit public comment on a petition by GreenWorld to establish a 500 yard "protection zone" around every Right whale and a 100 yard "protection zone" around other whales. *North Atlantic Right Whale Protection,* 59 Fed.Reg. 66,513, 66,514 (1994).

On June 3, 1994, NMFS designated a critical habitat for the Northern Right whale in portions of the Cape Cod Bay, the Stellwagen Bank, the Great South Channel, and in the Southeast United States. *See* 59 Fed. Reg. 28,793, 28,797–28,798 (1994). Designation of a critical habitat "provides notice to Federal agencies and the public that a listed species is dependent on these areas and its features for its continued existence. . . ." *Id.* at 28,793.

### B. *The Coast Guard and Its Mission*

The Coast Guard, which operates under the Department of Transportation, (Defs. Mem. Opp. Prelim. Injunc. at 2–3), conducts extensive marine operations, such as rescues at sea; navigation assistance; drug enforcement; and immigration enforcement. (Riutta Decl. at ¶ 5.) It also documents and inspects numerous vessels, which cannot legally operate within 200 miles of the U.S. coastline without a certificate from the Coast Guard (or from the state government). (Amended Answer ¶ 42.) The Coast Guard has issued Certificates of Documentation and Inspection to at least two whale watching vessels—the New England Aquarium's "Voyager II" and the Bay State Cruise Company's "Commonwealth"—with knowledge that the vessels were engaged in whale watching. (Amended Answer at ¶¶ 49, 50, and 51.)

### C. *The Coast Guard's Response*

There have been two documented deaths of Northern Right whales due to collisions with Coast Guard vessels. One occurred in 1991 and the other in 1993. (Defs.

Mem. Opp. Prelim. Injunc. at 3). On July 6, 1991, the Coast Guard Cutter "Chase," traveling at 20–22 knots, (Complaint ¶ 38; Amended Ans. ¶ 38), struck and killed a Right whale off the Virginia Cape, southeast of the Delaware coast. On January 5, 1993, the Cutter "Point Francis," which allegedly was traveling at full speed, (Complaint ¶ 39), struck and mortally injured a juvenile Right whale, which was found on shore a few days later and examined by the U.S. Fish and Wildlife Service. (Defs. Mem. Opp. Prelim. Inj. at 3; Amended Ans. ¶ 39.)

The Coast Guard states that it "does not have the capability to determine the presence of protected marine species from operating vessels other than by physical observation," and that Coast Guard cutters "have full-time (24–hour) lookouts who are instructed to warn the vessel's operators about the presence of whales." (Riutta Decl. ¶ 7.)

The Coast Guard has not obtained an ESA "incidental take" permit or statement allowing the agency, incidentally but not purposefully, to kill or otherwise "take" any endangered species of whales as a result of its vessel operations. (Complaint ¶ 92; Amended Ans. ¶ 92.) The Coast Guard also has not obtained an MMPA "small take" permit allowing it to injure or kill small numbers of whales incidentally to its vessel operations. (Complaint ¶ 96; Amended Ans. ¶ 96.) The Coast Guard reports that "NMFS has indicated that it likely could not issue an MMPA Section 101(a)(5) permit that authorizes any amount of incidental vessel strikes on Northern Right whales. The depleted nature of Northern Right Whale stocks would likely prevent NMFS from making the necessary finding that such takes would have 'a negligible impact upon such species.' 16 U.S.C. § 1371(a)(5)(A)(i)." (Def. Statement Regarding Compliance with the Marine Mammal Protection Act at 2–3). The Coast Guard does not keep records regarding deaths of marine mammals in general. (Defs. Mem. Opp. Prelim. Inj. at 3.)

This Complaint was filed on June 7, 1994. In response, the Coast Guard formed the Endangered Species Act Compliance Team (ESACT) and the Endangered Species Act Biological Assessment Team (ESABAT). (Defs. Mem. Opp. Prelim. Injunc., Riutta Decl. ¶3; Marquardt Decl. ¶ 1.) ESABAT is responsible for preparing the Biological Assessment required for formal consultation with NMFS. (Marquardt Decl. ¶ 1.) ESABAT also expects to prepare "[a]n appropriate environmental analysis... pursuant to the National Environmental Policy Act ... to analyze the impacts of Coast Guard operations and the alternatives to eliminate or lessen those impacts." (Marquardt Decl. ¶ 3.)

In accordance with a proposal by ESABAT, the Coast Guard has begun broadcasting and publishing a notice to mariners during the calving season of the Northern Right whale (December through March). (Marquardt Decl. at 3–4; Def. Mem. Opp. Prelim. Injunc. Ex. 3; 59 Fed.Reg. at 28799.) The notice warns mariners to post extra watches during daylight hours, reduce speeds to 5 knots at night and during poor visibility, maintain a distance of 500 meters from any whales sighted, and report any sightings to the Coast Guard. *Id.*

The Coast Guard also has a representative (Marquardt) on the Southeastern U.S. Implementation Team for the Recovery of the Northern Right Whale. (Marquardt Decl. ¶ 5.) The Coast Guard committed to "contribute $80,000 toward aerial monitoring of the northern right whale calving season from December 1, 1994 to March 31, 1995." *Id.;* *cf.* 59 Fed.Reg. at 28798 (discussing contribution of Navy and Coast Guard to aerial monitoring during calving season in 1993–1994).

In November of 1994, the First Coast Guard District[3] adopted a comprehensive "Marine Mammal and Endangered Species Protection Program" ("Whale Protection Program"). (Def.Mem.Mot.Summ.Judgment, Ex. A.) The Whale Protection Program applies "to littoral and offshore waters" in the First District, with special focus on the Stellwagen Bank National Marine Sanctuary ("SBNMS") and designated critical habitats.

---

3. The First District covers "Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York and New Jersey south to Toms River."

(Endangered Species Act Biological Assessment for the U.S. Atlantic Coast (Mar. 29, 1995) ("Biological Assessment") at 4–2.)

*Id.* at 2. As part of the Whale Protection Program, Coast Guard units "will be routinely tasked to conduct enforcement boardings, disseminate information packets, and make broadcasts to mariners in the vicinity of the SBNMS and other areas of interest." *Id.* In addition, aerial surveys will be conducted periodically, patrol efforts will be documented, and safety broadcasts will be continued. *Id.* at 2–3. The Whale Protection Program also establishes guidelines for the operation of Coast Guard vessels. First, "[d]uring the course of normal, non-emergency operations, First District units transiting the SBNMS, northern right whale critical habitat areas, or other areas frequently used by right whales…shall use caution and be alert for whales, using speed proportional to the mission to reduce the possibility of whale strikes." *Id.* at 3. Second, "[i]f a First District unit sights a whale(s)," that unit shall:

(1) Give whales a wide berth, using speed proportional to the mission to reduce the possibility of whale strikes.

(2) Maintain a lookout to best avoid contact with the whales.

(3) Notify vessels in the vicinity about the location of the whales via VHF radio, and direct those vessels to proceed through the area with caution.

(4) Inform OPCON immediately of any sightings of right whales or any other whale that is entangled, injured or dead. Also notify OPCON of any sightings of pilot whales in the vicinity of Cape Cod.

(5) Secure the area to keep onlookers from interfering with personnel authorized to respond to an injured, dead, entangled or stranded protected species. "Authorized" personnel should possess a federal or state permit.

(6) Complete and forward the sighting report. . . .

*Id.* at 3–4. The Whale Protection Program also gives "OPCON" (Operations Control) extensive responsibility in protecting whales and establishes a "Whale Sighting Program" to assist NMFS. *Id.* at 4–5. Finally, the Whale Protection Program mandates en-

forcement of the MMPA and ESA, and details the manner in which enforcement actions should be carried out. *Id.* at 6–8. The broad definition of "harassment" is thoughtfully explained, and a standard is established for documenting and issuing a violation of the MMPA or ESA. *Id.* at 6–8. In particular, the enforcement section of the Whale Protection Program notes the Right whale buffer zone applicable in Massachusetts waters. *Id.* at 7–8. Although most vessels in violation may be boarded, commercial whale watching boats are not to be boarded. *Id.* at 8. Instead, the Coast Guard unit is to "warn and document suspected violators. and forward completed case package to CCGDONE (ole) for further review. "[4] *Id.*

On January 5, 1995, the First Coast Guard District entered into a "Memorandum of Agreement" with the Stellwagen Bank National Marine Sanctuary and the National Marine Fisheries Service. (Def.Mem.Mot.Summ.Judgment, Ex. B.) The Stellwagen Bank National Marine Sanctuary lies between Cape Cod and Cape Ann, Massachusetts. *Id.* at 1. The First Coast Guard District agreed to perform numerous enforcement activities, subject to availability of resources, in cooperation with the Sanctuary and NMFS. *Id.* at 2. For example, the Coast Guard agreed to "[p]rovide targeted and dedicated enforcement patrols in the Sanctuary, especially during the months April through October, when the Sanctuary's heaviest public use occurs." *Id.*

The Coast Guard requested formal consultation under the ESA with NMFS on July 5, 1994. (Defs.Mem.Opp.Prelim.Injunc., Ex. # 2.) On March 31, 1995, the Coast Guard submitted a Biological Assessment, analyzing the effects of vessel operations, including aids-to-navigation activities, search and rescue missions, law enforcement activities, and marine safety and pollution response activities, to NMFS. (*See* Endangered Species Act Biological Assessment for the U.S. Atlantic Coast (Mar. 29, 1995) ("Biological Assessment") and letter from Captain Creech, USCG, to Dr. Fox, NMFS, dated Mar. 31,

---

4. "CCGDONE (ole)" is an abbreviation for the Commander, Coast Guard District One, Opera-

tional Law Enforcement.

1995.) Submission of the Biological Assessment started the 90–day time period for completion of formal consultation. *See* 50 C.F.R. § 402.14(e). In its Appendix B, the Biological Assessment estimates the impact of each category of Coast Guard operations on the Northern Right whale as "unlikely." Of particular concern, however, are Coast Guard search and rescue ("SAR") operations, for which the Biological Assessment states:

> The primary danger to whales and turtles from CG SAR operations is collision with vessels while the mammals are on the ocean surface. On the east coast of the US, approximately 42% of SAR cases are handled by Coast Guard boats and cutters, resulting in around 18,500 sorties per year. Of these, over 90% are in coastal regions where water depth is less than 200 meters (the principal habitat and migration zone for whales and turtles). Approximately 77% of these cases are non-emergent in nature, that is, vessels are able to divert from their course or travel at moderate speeds, allowing them to easily avoid sea life. This leaves about 3,800 sorties annually when vessels are operating at high speeds and time is of the essence to save human lives and property. Despite this level of activity, there are no documented collisions between Coast Guard vessels and whales or turtles during SAR operations.

> Coast Guard vessels are required to have a designated lookout to assist the conning officer or coxswain in watching for other marine traffic and in avoiding objects (such as whales and turtles) in the water. In addition, standing orders to boat coxswains and conning officers direct them to steer clear of objects in the water. These standard operating procedures significantly decrease the likelihood that a Coast Guard vessel will collide with a whale or turtle during SAR operation.

> The Northern Right whale is the species most in danger of biological impact from CG SAR operations. This is due primarily to the whales, habit of feeding and calving at or near the ocean surface. Still, there is actually little potential for biological impact from CG SAR operations.

(Biological Assessment at B–2.)

For the Great South Channel:

> There are almost no SAR cases in the area of the Great South Channel. There are approximately 17 cases annually which result in about 26 vessel sorties. In addition, there are about 35 cases annually which require Coast Guard vessels to transit the Great South Channel. This results in a total of about 40 vessel transits of the Great South Channel area during spring feeding and an annual total of about 100 vessel transits. It is highly unlikely that CG SAR operations would have any biological impact on the Northern Right Whale in the Great South Channel area.

*Id.* at B–2 to B–3.

For the Cape Code Bay and Massachusetts Bay:

> There are approximately 1,900 vessel SAR cases in the Massachusetts Bay & Cape Code Bay area annually. Of these, about 19% are emergent in nature, resulting in approximately 90 vessel sorties over the three month feeding period. This is the area with the highest chance for biological impact from CG SAR operations. Still, the tempo of operations indicates an average of only one sortie per day, making it unlikely that CG SAR operations would have any biological impact on the Northern Right Whale in the Cape Cod Bay and Massachusetts Bay area.

*Id.* at B–3.

In light of the Biological Assessment's assertions that there have been "no documented collisions between Coast Guard vessels and whales" during search and rescue operations, (Biological Assessment at B–2), and that "no collision of a Coast Guard ship or boat with a Right Whale during law enforcement operations has been documented," *id.* at B-1, it would appear that the two strikes of Northern Right whales by Coast Guard cutters in 1991 and 1993 respectively, which are not mentioned in the Biological Assessment, did not occur during search and rescue or law enforcement operations.

**D.** *Course of Proceedings*

At a scheduling conference for this matter on November 10, 1994, Strahan filed a mo-

tion for a temporary restraining order and preliminary injunction: (1) restraining the Coast Guard from allowing any of its vessels to approach or operate within 500 yards of any Northern Right whale or to approach or operate within 100 yards of any Humpback whale, Fin whale, Sei whale, Blue whale, or Minke whale; (2) ordering the Coast Guard to enforce the same minimum approach distance for any other person or vessel; (3) restraining the Coast Guard from operating any vessel in a critical habitat for the Northern Right whale without first monitoring the area for the possible presence of Northern Right whales and then only at the slowest speed that would be safe given sea conditions.

At the scheduling conference, I denied Strahan's motion for a temporary restraining order and directed that, on November 22, 1994, Strahan be deposed and the defendants provide the logs of two vessels to Strahan.

On December 9, 1994, the defendants filed a motion for sanctions, stating that Strahan had failed to appear for his scheduled deposition. The defendants stated that Strahan called them the day before the scheduled deposition and informed them that he would not attend the deposition unless the Coast Guard produced "all Section 7 material" and told him the questions they would be asking. (Defs. Mem. Sanctions at 3.) Defense counsel traveled from Washington, D.C. to Boston to take Strahan's deposition on November 22, 1994. Strahan called again and repeated his demands, stating that the deposition was a "quid pro quo" for the production of documents. (Defs. Mem. Sanctions at 4.) He offered to attend the deposition for $50.00. *Id.* The defendants refused the offer. Strahan did not attend the deposition nor did he inspect or copy the vessel logs that were made available. *Id.* Strahan also did not inspect the NMFS documents that were produced in response to his subpoena. (Defs.Mot.Sanctions, Ex. 2.) The defendants requested payment of expenses and attorneys' fees, in the amount of $2,000. Strahan filed an amended motion for a preliminary injunction on December 13, 1994.

At the hearing on December 13, 1994, I declined to address Strahan's motion for a preliminary injunction because Strahan had not been deposed. Based upon Strahan's assertion that he was indigent, I denied the defendants' motion for sanctions at that time, but informed Strahan that the case would be dismissed if he did not attend the next deposition, which was scheduled by consent of the parties for the week of January 9, 1995. I also ordered that the defendants produce certain nonprivileged relevant documents for Strahan, and file an index of the documents produced with the Court. The defendants have complied with this order.

Strahan was deposed on January 9, 1995. On January 24, 1995, the defendants filed their Motion for Summary Judgment. Strahan filed his response on February 3, 1995, but neglected to attach all the exhibits. A procedural order was issued on February 6, 1995, directing that Strahan file the missing exhibits by February 9, 1995. A hearing on the motion for preliminary injunction was held on February 10, 1995. This Memorandum incorporates my findings and conclusions regarding the defendants' motion for summary judgment and Strahan's motion for a preliminary injunction.

### III. *Jurisdiction and Standing*

Strahan's claims are grounded in the Endangered Species Act ("ESA"), the Administrative Procedure Act ("APA"), and the Declaratory Judgment Act. The ESA expressly authorizes citizen suits in federal district court, 16 U.S.C. § 1540(c) (1988 & Supp. V). Section 1540(g)(1) provides that, with certain exceptions:

any person may commence a civil suit on his own behalf—(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or (B) to compel the Secretary to apply ... the prohibitions...with respect to the taking of any resident endangered species or threatened species within any state;....

16 U.S.C. § 1540(g)(1) (1988 & Supp. V).

While there is no citizen suit provision under the MMPA, WCA, or NEPA, Stra-

han's claims under those statutes proceed under the Administrative Procedure Act, 5 U.S.C. § 702. The APA permits a reviewing court to:

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

5 U.S.C. § 706 (1988 & Supp. V).

Strahan's request for declaratory relief is authorized under the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Although the Declaratory Judgment Act is not an independent basis of jurisdiction, it makes available an additional remedy where the court already has jurisdiction, *Greene v. Costle*, 577 F.Supp. 1225 (W.D.Tenn.1983). As the language of the Declaratory Judgment Act makes clear, the key requirement is that an "actual controversy" exist. In this case, an actual controversy exists between the Coast Guard and Strahan as to whether the Coast Guard has violated the ESA, MMPA, WCA, and NEPA. Thus, Strahan has a statutory basis for the relief he seeks. Before reaching the merits of the case, however, I must address the question whether Strahan has standing to seek this relief.

Federal jurisdiction under Article III of the United States Constitution is limited to "Cases" and "Controversies." As the Su-

preme Court explained in *Lujan v. Defenders of Wildlife*, there are three elements to the "irreducible constitutional minimum" of standing:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical'[.]" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted) (alterations in original); *see also Libertad v. Welch*, 53 F.3d 428, 435–36 (1st Cir.1995). The Supreme Court added that, in order to be "particularized," the injury "must affect the plaintiff in a personal and individual way." 504 U.S. at 561 n. 1, 112 S.Ct. at 2136 n. 1.

A plaintiff who has brought suit in federal court has the burden of establishing these elements. *Id.* at 560–61, 112 S.Ct. at 2136. To defeat a summary judgment motion, the plaintiff must provide, by affidavit or other documentary evidence, Fed.R.Civ.P. 56(e), sufficient facts, which will be taken as true, 504 U.S. at 561–63, 112 S.Ct. at 2137, to indicate that there is a "genuine issue of material fact," Fed.R.Civ.P. 56(c), concerning standing, 504 U.S. at 590, 112 S.Ct. at 2152 (Blackmun, J., dissenting).

Strahan cannot bring suit "on behalf of" the whales because the whales, although allegedly directly injured by the Coast Guard's action (and inaction), are animals and therefore lack standing to sue. *See Citizens to End Animal Suffering and Exploitation, Inc. v. New England Aquarium*, 836 F.Supp. 45, 49–50 (D.Mass.1993). *But see Palila v. Hawaii Dep't of Land and Natural Resources*, 852 F.2d 1106, 1107 (9th Cir.1988) ("As an endangered species under the [ESA],

the bird [Palila] (Loxioides bailleui), a member of the Hawaiian honeycreeper family, also has legal status and wings its way into federal court as a plaintiff in its own right."); *American Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir.1993) (apparently allowing animal to be named as plaintiff and reaching the merits without addressing the standing question) (decided one month after *New England Aquarium* ). As a result, the burden on the plaintiff is heavier because the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else...." *Defenders of Wildlife*, 504 U.S. at 562, 112 S.Ct. at 2137.

Strahan cannot bring suit solely because he has a sincere and passionate interest in the well-being of the whales. *See United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir.1992); *Defenders of Wildlife*, at 597 n. 3. 112 S.Ct. at 2140 n. 3. Strahan must show not only that the named whales are harmed by the Coast Guard's actions, but also that he will thereby be "directly affected" by the harm to the whales, apart from his alleged (Complaint ¶ 12) special interest as a dedicated advocate for endangered species and as a religious supporter of biological diversity. *See Defenders of Wildlife*, 504 U.S. at 563–64, 112 S.Ct. at 2138.

Upon the record before me, I find, and defendants concede, that Strahan has standing to sue with respect to Coast Guard activities in the waters of the First District. Strahan has stated that he engages in personal observation of whales, from the coast and, "as many as four to five times" per year, from whale watch boats. (Strahan Depos. at 39–40.) *See Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986) (respondents "undoubtedly have alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting, and this type of injury is within the 'zone of interests' protected by the Pelly and Packwood Amendments [to the fishery acts]"); *Defenders of Wildlife*, 504 U.S. at 561–63, 112 S.Ct. at 2137 ("[o]f course, the desire to use or observe an animal species, even for purely aesthetic pur-poses, is undeniably a cognizable interest for the purpose of standing"). Strahan also states, in his affidavit (and in his deposition, at 47), that he is "organizing an extensive infield research effort to do field research on whales with [his] own dedicated vessel." (Strahan Aff. at 3.) In his deposition, Strahan also provides sufficient details regarding the frequency and location of his "enjoyment" of the whales. *See Animal Legal Defense Fund, Inc., v. Espy*, 23 F.3d 496, 499–501 (D.C.Cir.1994); *cf. AVX Corp.*, 962 F.2d at 116–18.

Strahan has specified the manner in which Coast Guard operations in the First District may directly impair his enjoyment, i.e., by decreasing the number of whales he may observe by interfering with the breeding and foraging of the whales, as well as by directly injuring or killing whales through accidental collisions.

Finally, for standing purposes, it is likely that the harm to the whales allegedly caused by Coast Guard activities would decrease if Strahan's request for an injunction were granted.

Strahan does not, however, have standing to sue with respect to Coast Guard activities in other regions of the United States because he has only vague plans "some day" to observe whales there, (Strahan Depos. at 37). Strahan went whale watching in California and in Georgia only once, in the late 1980's or early 1990's. *Id.* at 40–41. He states in his Deposition that he plans "to go out on the West Coast and whale watch, maybe, this year. In fact, more than a maybe." *Id.* at 37. In his Affidavit, Strahan states: "I want to make it clear, that I absolutely will visit the Pacific Coast this coming spring and also in 1996 and 1997 to do research on whales and to 'whale watch' them." (Strahan Aff. at 3.) These statements by Strahan, which lack any support such as specific dates or funding sources, are insufficient to confer standing to challenge Coast Guard activities off the Pacific Coast. *See Defenders of Wildlife*, 504 U.S. at 563–64, 112 S.Ct. at 2138. In this case, I will not credit Strahan's "purely conclusory allegations," *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citations omitted), regarding his

plans to observe whales on the Pacific Coast. I am satisfied that Strahan *hopes* to go to the Pacific, but I am unpersuaded that he has definite and concrete prospects for doing so. His passionate interest in the Pacific whale, expressed at such a great distance, is insufficient to confer standing under Article III. As the Supreme Court explained in *Lujan:*

> It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible—though it goes to the outer limits of plausibility—to think that a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that might have been the subject of his interest will no longer exist. It goes beyond the limit, however, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.

*Id.* at 565–68, 112 S.Ct. at 2139–40 (citing *Japan Whaling Ass'n* ) (footnote omitted).

Thus, I find that Strahan has standing under Article III to bring this action with respect to Coast Guard activities in the First District only. I therefore turn to the merits of the defendants' motion for summary judgment and Strahan's motion for a preliminary injunction. I will address the summary judgment motion first because, if Strahan's Complaint cannot survive a motion for summary judgment, his motion for a preliminary injunction is effectively denied.

### IV. *Coast Guard's Motion for Summary Judgment*

Under Fed.R.Civ.P. 56, summary judgment must be granted "where the pleadings, depositions, answers or interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993) (citing Fed.

R.Civ.P. 56(c)). In reviewing such materials, I must view all the facts "in the light most favorable to the non-moving party and indulge all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

In evaluating a summary judgment motion, "[i]nitially, the onus falls upon the moving party to aver 'an absence of evidence to support the nonmoving party's case.'" *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993) (citations omitted), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Once this has been accomplished, it is then incumbent upon the nonmovant to show that there is in fact a "'genuine issue for trial'". *Id.* (citation omitted). In this effort, merely conjectural or problematic evidence will not suffice; nor will simple recurrence to the claims presented in the pleadings. *See Goldman,* 985 F.2d at 1119. Rather, an issue will be considered trialworthy only if "there is enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman,* 985 F.2d at 1116. With these considerations in mind, I turn to the merits of Strahan's claims under each federal act.

### A. *Endangered Species Act*

The Endangered Species Act is a powerful and substantially unequivocal statute. *See generally* Frederico M. Cheever, *An Introduction to the Prohibition Against Takings in Section 9 of the Endangered Species Act of 1973: Learning to Live with a Powerful Species Preservation Law,* 62 U. Colo. L.Rev. 109 (1991); Douglas A. Chadwick & Joel Sartore, *Dead or Alive: The Endangered Species Act,* Nat'l Geographic 2–41 (Mar.1995). The key provisions of the ESA are contained in Sections 7 and 9.

#### 1. *Section 7 of the ESA*

Section 7(a)(2) of the ESA requires that:

Each Federal agency shall, *in consultation with* and with the assistance of the Secretary [of Commerce], insure that any action

authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical, unless such agency has been granted an exemption for such action by the [Endangered Species] Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2) (1988 & Supp. V) (emphasis added). *See also* 50 C.F.R. § 402.14 (formal consultation requirements); 50 C.F.R. § 402.12 (biological assessments). Section 7(a)(1) directs that all federal agencies "shall, in consultation and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered and threatened species...." 16 U.S.C. § 1536(a)(1) (1988 & Supp. V). Strahan claims the Coast Guard has violated Section 7 by: failing to consult with NMFS regarding Coast Guard vessel operations (Count I— § 7(a)(2)); failing to consult with NMFS regarding the issuance of Certificates of Documentation and Inspection (Count II— § 7(a)(2)); and failing to develop a conservation plan (Count III— § 7(a)(1)).

In the seminal ESA case, *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court held that the ESA barred the completion of a dam, on which Congress had already spent millions of dollars, that would have eradicated the endangered snail darter fish or destroyed its critical habitat. The Court explained that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act." 437 U.S. at 173, 98 S.Ct.

at 2291. "[E]xamination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." 437 U.S. at 174, 98 S.Ct. at 2292.

The defendants emphasize the importance of Coast Guard operations, (Defs. Mem. Opp. Prelim. Injunc. at 2–3), but their argument is misplaced. As the Supreme Court explained in *TVA v. Hill:*

> the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.

437 U.S. at 185, 98 S.Ct. at 2297. "[T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.' Quite obviously, it would be difficult for a court to balance the loss of a sum certain—even $100 million—against a congressionally declared 'incalculable' value, even assuming we had the power to engage in such a weighing process, which we emphatically do not." 437 U.S. at 187–88, 98 S.Ct. at 2298. Finally, "there are no exemptions in the Endangered Species Act for federal agencies, meaning that under the maxim *expressio unius est exclusio alterius,* we must presume that [the narrow 'hardship' exemptions in the ESA] were the only 'hardship cases' Congress intended to exempt." 437 U.S. at 188, 98 S.Ct. at 2298 (citation and footnote omitted).[5] *See also Romero–Barcelo v. Brown,* 643 F.2d 835, 857–58 (1st Cir. 1981), *rev'd on other grounds sub nom., Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

---

5. Although Congress amended the ESA in 1978 in response to *TVA v. Hill,* it is very difficult for a federal agency to meet the stringent criteria and obtain approval for an exemption from the Endangered Species Committee. *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 n. 10 (9th Cir.1987) ("these amendments do not diminish the prece-

dential force of the Supreme Court's decision in *TVA v. Hill* "); *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 9 (9th Cir.1994) (exceptions for extraordinary circumstances only), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995).

Although the Coast Guard has started the Section 7 formal consultation process with NMFS concerning its vessel operations, including aids-to-navigation activities, search and rescue missions, law enforcement activities, and marine safety and pollution response activities, (Defs.Mem.Opp.Prelim.Injunc., Ex. 2), I find that summary judgment for the Coast Guard is not warranted as to Counts I and III because, until the consultation process is complete, the Coast Guard is not in full compliance with ESA Sections 7(a)(2) and 7(a)(1). *See Pacific Rivers Council v. Thomas*, 873 F.Supp. 365, 370 (D.Idaho 1995) (denying summary judgment to Forest Service because consultation was not complete). In addition, the dilatory tactics of the Coast Guard make continued judicial supervision appropriate.

I conclude, however, that the Coast Guard is not required to *initiate* consultation with respect to the issuance of Certificates of Documentation and Inspection because this is nondiscretionary agency action within the meaning of the ESA. It is true that "action" is defined broadly under the ESA.[6] 50 C.F.R. § 402.02 defines "action" covered by Section 7 of the ESA to mean:

all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

Federal regulations, however, provide that "Section 7 and the requirements of [the ESA regulations] apply to all actions in which there is *discretionary* Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added).

Research has disclosed only one decision addressing the meaning of the term "discretionary" in 50 C.F.R. § 402.03. In *Florida Key Deer v. Stickney*, 864 F.Supp. 1222, 1239 (S.D.Fla.1994), the court found that the term "pertained to geographical limitations, rather than discretion to administer the federal activity." In support of this somewhat surprising conclusion, the court offered statements from the legislative history of the ESA and from *TVA v. Hill* that emphasized the sweeping nature of the ESA. 864 F.Supp. at 1238–39. While interesting, these statements are not determinative of the specific question whether Congress intended the ESA to apply to nondiscretionary, ministerial acts of federal agencies.

The *Florida Key Deer* court also cited a portion of the Preamble to the Section 7 regulations, which states:

Section 402.03—Applicability

This section, which explains the applicability of Section 7, implicitly covers Federal activities within the territorial jurisdiction of the United States and the high seas as a result of the definition of "action" in § 402.02. The explanation for the scope of the term "action" is provided in the discussion under § 402.01 above.

*Interagency Cooperation—Endangered Species Act of 1973, as Amended, Final Rule*, 51 Fed.Reg. 19,937 (1986) (cited in *Florida Key Deer*, 864 F.Supp. at 1239). Far from supporting the *Florida Key Deer* court's understanding of the definition of "discretionary," this excerpt from the Preamble, on its face, indicates that it is the term "action" that is geographically limited, not the term "discretionary." *See also* 51 Fed.Reg. 19,929 (discussing territorial limit on scope of term "action"); 50 C.F.R. § 402.02 (defining "action" as limited to activities "in the United States or upon the high seas").

In addition, the discussion of the amended regulations in the Final Rule appears to as-

---

**6.** *See Pacific Rivers Council v. Thomas*, 30 F.3d at 1054 ("there is little doubt that Congress intended to enact a broad definition of agency action in the ESA, and therefore that the [Forest Service's land resource management plans] are continuing agency action"), *cert. denied*, 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995);

*Lane County Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir.1992) (holding, *inter alia*, that document promulgated by Bureau of Land Management for conservation of the northern spotted owl was "agency action" requiring consultation under ESA).

sume that the "action" involved is discretionary because it repeatedly uses the phrase "proposed action" interchangeably with the term "action." *See, e.g.,* 51 Fed.Reg. at 19,928, 19,932, 19,933. This is understandable given that the purpose of the consultation process is to inform the federal agency of the consequences of its actions. In particular, the agency should be told of "reasonable and prudent alternatives" that "can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction" and would "avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.01. If the federal agency has no discretion to modify the activity at issue to accommodate the mandate of the ESA, then the consultation process would be pointless.

The *Florida Key Deer* court also may not have been entirely convinced of its reading of the term "discretionary," because it proceeded to find that the Federal Emergency Management Agency ("FEMA") did in fact "have ample discretion to implement the [National Flood Insurance Program] in a way that is compatible with the ESA." 864 F.Supp. at 1239. In particular, the court noted that "Congress gave FEMA broad discretion to 'issue such regulations' as may be necessary to carry out the purpose of [the flood insurance act]" and that FEMA had "broad discretion to establish specific criteria of eligibility for communities to participate in the [National Flood Insurance Program]." *Id.* (citations omitted).

A review of the Coast Guard's statutory authority and regulations demonstrates that, unlike FEMA's administration of the flood insurance program, the Coast Guard's documentation and inspection of vessels is a non-discretionary activity. *Cf. Sugarloaf Citizens Ass'n v. Federal Energy Regulatory Comm'n,* 959 F.2d 508, 513 (4th Cir.1992) (holding FERC lacked discretion to deny certification to any facility meeting the criteria for qualified small power producer and therefore certification was merely ministerial act not subject to NEPA). The Coast Guard is required to issue Certificates of Documentation and Inspection if the specific statutory and regulatory criteria, which make no reference to environmental concerns, are met. *See* 46 U.S.C. §§ 3305–3309 (certificates of inspection);[7] 46 U.S.C. §§ 12102–12122 (documentation);[8] 46 C.F.R. pt. 67 (documentation) *cf. Lobo v. Commissioner,* 54 T.C.M. (CCH) 1598 (1988) (holding that once petitioner had filed every document required for documentation "the furnishing of an official

---

7. For example, 46 U.S.C. § 3305(a), which establishes the "[s]cope and standards of inspection," provides:

> The inspection process shall ensure that a vessel subject to inspection—
> (1) is of a structure suitable for the service in which it is to be employed;
> (2) is equipped with proper appliances for lifesaving, fire prevention, and firefighting;
> (3) has suitable accommodations for the crew, sailing school instructors, and sailing school students, and for passengers on the vessel if authorized to carry passengers;
> (4) is in a condition to be operated with safety to life and property; and
> (5) complies with applicable marine safety laws and regulations.

Section 3309(a) provides that: "When an inspection under section 3307 of this title has been made and a vessel has been found to be in compliance with the requirements of law and regulations, a certificate of inspection, in a form prescribed by the Secretary, *shall be issued* to the vessel." (emphasis added).

8. Section 12102(a) of Title 46 provides, in part, that:

> A vessel of at least 5 net tons that is not registered under the laws of a foreign country or is not titled in a State is eligible for documentation if the vessel is owned by—
> (1) an individual who is a citizen of the United States;
> (2) an association, trust, joint venture, or other entity—
> (A) all of whose members are citizens of the United States; and
> (B) that is capable of holding title to a vessel under the laws of the United States or of a State;
> (3) a partnership whose general partners are citizens of the United States, and the controlling interest in the partnership is owned by citizens of the United States;
> . . .

Section 12103(a) directs that: "Except as provided in section 12123 of this title, on application by the owner of a vessel eligible for documentation, the Secretary of Transportation shall issue a certificate of documentation endorsed with one of more of the endorsements specified in sections 12105–12109 of this title."

number to petitioner, so that the required [certificate of] marking could be made, and the issuance of the certificate of registry were ministerial acts to be performed by the Coast Guard") (footnote omitted). The only area of discretion that Strahan has identified is in 46 U.S.C. § 12112(c), which allows the Coast Guard (as the delegate of the Secretary of Transportation) to "suspend for a period of not more than 6 months, the application of a vessel inspection law ... if the Secretary considers the suspension to be in the public interest." Even this section applies only to vessels procured outside the United States. 46 U.S.C. § 12112(a).

Given its nondiscretionary responsibilities in the documentation and inspection of vessels, the Coast Guard is not required to *initiate* formal consultation with NMFS regarding these matters. Nevertheless, the potentially significant environmental impacts of the Coast Guard's documentation and inspection activities must be considered in the formal consultation process that the Coast Guard currently is conducting. The impact of the Coast Guard's issuance of Certificates of Documentation and Inspection, which allow numerous private vessels to operate in the coastal waters, clearly must be considered by NMFS as "cumulative effects" on the area where Coast Guard vessels will operate. 50 C.F.R. § 402.14(g)(3). "Cumulative effects" are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. NMFS has noted that:

> a Federal agency, when evaluating the environmental impacts of a proposed action, must comply with NEPA. Since this compliance includes an analysis of cumulative effects, [NMFS] believes that *it is the Federal agency's responsibility to develop this information.* The cumulative effects

analysis conducted in compliance with the broad definition under NEPA may be submitted to [NMFS] by the Federal agency when initiating formal consultation. [NMFS] can use this analysis and apply its narrower definition of cumulative effects when analyzing whether a proposed action, along with cumulative effects, violates section 7(a)(2) of the Act.

51 Fed.Reg. at 19,932 (emphasis added).

Strahan also claims that the Coast Guard has violated the ESA by failing to enforce the ESA in general (Count VI) and for whale watch vessels in particular (Count V). Although the Coast Guard shares responsibility for enforcing the ESA at sea with the Department of Commerce, 16 U.S.C. § 1362(12)(A)(i) & § 1532(15), and, in particular, with NMFS, 50 C.F.R. § 217.1, *see* 16 U.S.C. § 1540(e);[9] 50 C.F.R. § 217.12[10]; Defs. Mem. Supp. Mot. Summ. Judgment, Ex. A at 1 ("The Coast Guard and NMFS are equally responsible for enforcing violations of the Endangered Species Act (ESA)."), there is no basis in this record to order the defendants to take the enforcement actions Strahan has requested. The Coast Guard recently has increased its efforts to enforce the ESA, (Defs. Mem. Support Mot. Summ. Judgment Ex. A), and has enforced the ESA to some extent during the past several years, (Christovich Decl. Ex. 1). Strahan has not presented sufficient evidence to overcome the presumption of unreviewability that accompanies agency decisions not to undertake ad hoc enforcement action. *See generally Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Action for Children's Television v. FCC*, 999 F.2d 19 (1st Cir.1993) (applying minimal justification standard of deference to FCC decision declining to take action to close loophole in Cigarette Act). Thus, I will grant sum-

---

9. Section 1540(e)(1) provides that: "The provisions of this chapter and any regulations or permits issued pursuant thereto shall be enforced by the Secretary [of Commerce], the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating, or all such Secretaries...."

10. Section 217.12 defines an "authorized officer" who can enforce the ESA and the Fish and Wildlife Act as "(1) Any commissioned, warrant, or petty officer of the U.S. Coast Guard; (2) Any special agent or enforcement officer of the National Marine Fisheries Service; ... (4) Any Coast Guard personnel accompanying and acting under the direction of any person described in paragraph (1) of this definition."

mary judgment for defendants as to Counts V and VI of Strahan's Complaint.

Finally, I note that the Coast Guard is obligated to consult with NMFS for emergency activities, such as search and rescue operations, that occur in critical habitat areas even before formal consultation is complete. NMFS regulations allow expedited consultation in emergency situations:

(a) Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)–(d) of the Act. This provision applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc.

(b) Formal consultation shall be initiated as soon as practicable after the emergency is under control. The Federal agency shall submit information on the nature of the emergency action(s), the justification for the expedited consultation, and the impacts to endangered or threatened species and their habitats. The Service will evaluate such information and issue a biological opinion including the information and recommendations given during the emergency consultation.

50 C.F.R. § 402.05. NMFS has explained this provision as follows:

The Service [NMFS] recognizes that it is sometimes necessary to take immediate steps to contain, limit, or alleviate an emergency in order to protect health, safety, and welfare prior to initiating any form of consultation. However, the Service would like to stress the fact that its early involvement is important in order to take advantage of its expertise in minimizing the effects of emergency response activities on endangered and threatened species. Federal agencies must exercise discretion when responding to an emergency as to when to consult the Service. This will depend on the nature of the emergency and the actions that are immediately required.

51 Fed.Reg. at 19,938. Apparently, NMFS will conduct informal consultation by telephone, where necessitated by an emergency situation. 51 Fed.Reg. at 19,938.

2. *Section 9 of the ESA*

Section 9(a)(1)(B) of the ESA makes it unlawful for any "person," which includes a federal agency, 16 U.S.C. § 1532(13), to "take" any endangered species of fish or wildlife within the United States or the territorial sea of the United States. 16 U.S.C. § 1538(a)(1)(B). The term "take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (1988 & Supp. V.). The term "harass" is defined by regulation to mean: "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3(c). "Harm" is defined as: "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id. Cf. Palila v. Hawaii Dep't of Land and Natural Resources,* 852 F.2d 1106 (9th Cir.1988) (holding permitting of sheep in habitat of endangered bird was a "taking"); *Defenders of Wildlife v. Administrator, EPA,* 882 F.2d 1294, 1300–01 (8th Cir.1989) (holding EPA violated the ESA by registering pesticides containing strychnine, which killed endangered animals, before it obtained permission from the Fish & Wildlife Service) ("Under the ESA ... an agency must obtain an incidental taking statement before it takes the protected species."). *But see Sweet Home Chapter of Communities for Great Oregon v. Babbitt,* 30 F.3d 190, 193 (D.C.Cir.1994) (holding taking prohibitions of section 9 do not cover habitat modifications where there is "no direct action by the defendant against any member of the species"), *cert. granted,* 513 U.S. 1072, 115 S.Ct. 714, 130 L.Ed.2d 621 (1995).

The Secretary of Commerce,[11] through NMFS, is authorized, after an opportunity for public comment, 16 U.S.C. § 1539(a)(2)(B), to issue permits authorizing "any taking otherwise prohibited by [the ESA] if such taking is incidental to, and not for the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B) (1988 & Supp. V). No permit may be issued unless the applicant has submitted a conservation plan specifying:

(i) the impact which will likely result from such taking;

(ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;

(iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

(iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

16 U.S.C.A. § 1539(a)(2) (1988 & Supp. V).

A federal agency also may obtain permission to take an endangered species at the conclusion of the Section 7 consultation process through an incidental take "statement."

If after consultation under [Section 7(a)(2)], the Secretary concludes that—

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency...with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with respect to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency ... to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4) (1988 & Supp. V); *see also* 50 C.F.R. § 402.14(i); 51 Fed.Reg. at 19,953–19,954 (discussing purpose of incidental take statement).

Once a federal agency has received the NMFS biological opinion and the incidental take *statement*, it need not obtain an incidental take *permit* under 15 U.S.C. § 1539(a)(2)(A). 51 Fed.Reg. at 19,953. This exemption from Section 9, however, "is limited to actions taken by the Federal agency ... that comply with the terms and conditions specified in the incidental take statement." 51 Fed.Reg. at 19,953. In addition, the agency must "immediately request reinitiation of formal consultation if the specified amount or extent of incidental take is exceeded." 51 Fed.Reg. at 19,954; 50 C.F.R. § 402.14(i)(4). NMFS has stated that it "will enforce the taking prohibitions of section 4(d) or 9 if the continuation of an action, after the anticipated level of incidental take has been reached, results in additional takings of listed species." 51 Fed.Reg. at 19,954.

The Coast Guard concedes that it has not received an incidental take permit or statement from the NMFS. (Amended Ans. ¶ 92.) The Coast Guard admits that it has killed two Northern Right whales in violation of the ESA and MMPA. (Amended Ans. ¶¶ 37, 38, 39; Defs. Mem. Opp. Prelim. Injunc. at 3; Defs. Memo Supp. Summ. Judgment at 28.) The Coast Guard originally argued that "[o]nce the consultation between the Coast Guard and NMFS is complete, Coast Guard activities will have the *benefit* of an incidental

---

**11.** I refer to the Secretary of Commerce because only marine mammals are involved in this case. Thus, the ESA duties of the Secretary of the Interior are not relevant here.

take statement exempting from the take prohibitions that level of take that is incidental to approved operations." (Defs. Mem. Supp. Mot. Sum. Judgment at 29 (citations omitted) (emphasis added).) The Coast Guard contended that the proper issue in this case was "whether plaintiff has shown a reasonable likelihood of future whale strikes by Coast Guard vessels between now and July 1995 that injunctive relief may remedy." *Id.* (citations omitted)

At oral argument on February 10, 1995, I called the Coast Guard's attention to the fact that an incidental take statement under the ESA *could not* issue because the Coast Guard has not yet applied for a small take permit under the MMPA. *See* Part IV.B, *infra.* In response, the Coast Guard submitted a "Statement Regarding Compliance with the Marine Mammal Protection Act," in which it explained:

> If the Coast Guard, in consultation with NMFS, cannot modify its operations to avoid injuries or mortalities of threatened and endangered marine mammals, the Coast Guard would normally seek authorization for such takes through MMPA Section 101(a)(5)(A). However, NMFS has indicated that it likely could not issue an NMFS Section 101(a)(5) permit that authorizes any amount of incidental vessel strikes on Northern Right Whales. The depleted nature of Northern Right Whale stocks would likely prevent NMFS from making the necessary finding that such takes would have "a negligible impact upon such species." 16 U.S.C. § 1371(a)(5)(A)(i).
>
> As a result of the foregoing, the Coast Guard will not immediately apply for authorization of incidental takes under the MMPA. Since the Coast Guard and NMFS may be able to avoid incidental takes through measures established during the ESA Section 7 process, application for an MMPA small take authorization would be unnecessary. Therefore, Coast Guard and NMFS's resources are presently better spent focussing on the ESA process rather than initiating an MMPA procedure that may very well be unneeded. In any event, if the Coast Guard is unable to ensure that

no incidental take will occur via vessel strikes, authorization under the MMPA is probably unavailable because NMFS will not likely approve such a request. Application for such an authorization would most likely be futile.

(Def. Statement at 2–3 (Feb. 16, 1995).)

I find that there is a disputed issue of material fact as to whether Coast Guard vessels will in the future "take" one or more Northern Right whales in violation of Section 9 of the ESA. The defendants' argument to the contrary rests on the fact that Strahan has proven "only" that Coast Guard vessels killed two Right whales since 1991, and that defendants have submitted evidence that the Coast Guard recently has increased its efforts to avoid whale strikes. (Defs. Mem. Supp. Summ. Judgment at 29–31.) Defendants' assessment is not sufficient to overcome summary judgment at this point.

Although the Coast Guard's increased efforts to avoid an incidental take would appear to diminish the potential for such an event, that potential is not eliminated. Moreover, the Coast Guard has made it clear that its missions have priority over the whales. *See* Def. Mem. Supp. Summ. Judgment Ex. A, at 3–4 ("[i]f a First District unit sights a whale(s), that unit shall: (1) Give whales a wide berth, using speed *proportional to the mission* to reduce the possibility of whale strikes.") (emphasis added); *id.* at 3 ("[d]uring the course of *normal, non-emergency operations,* First District units transiting the SBNMS, northern right whale critical habitats, or other areas frequently used by right whales ... shall use speed *proportional to the mission* to reduce the possibility of whale strikes.") (emphasis added). The Coast Guard's statement of the relative importance of the mission as opposed to species protection bespeaks a failure by the defendants to recognize the unqualified nature of ESA's directive. As the Supreme Court explained in *TVA v. Hill:* "The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." 437 U.S. at 185, 98 S.Ct. at 2297.

A declaratory judgment may ultimately prove necessary to disabuse the Coast Guard of its mistaken understanding of the unequivocal message of the ESA. A permanent injunction also may be required to prevent Right whale incidental takings by the Coast Guard. Resolution of these issues must await the completion and product of the consultation process. For the time being, summary judgment will not be granted for the Coast Guard as to Count IX of Strahan's Complaint.

### B. *Marine Mammal Protection Act*

The Marine Mammal Protection Act establishes a moratorium on the taking and importation of marine mammals and marine mammal products, with a few exceptions. 16 U.S.C. § 1371(a) (1988 & Supp. V). The Endangered Species Act and the MMPA both apply to the incidental taking of marine mammals that have been listed as endangered species. 16 U.S.C.A. § 1387(a)(2) (West 1995). NMFS enforces the MMPA as well as the ESA.

The MMPA defines the term "take" as: "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13) (Supp. V 1988). The term "harassment" is defined as: "any act of pursuit, torment, or annoyance which—(i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C.A. § 1362(18)(A) (West 1995) (added by Pub.L. No. 103–238, § 12, 108 Stat. 532 (Apr. 30, 1994)).

In its regulations, NMFS explains the definition of "take" as follows:

to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal. This includes, without limitation, any of the following: The collection of dead animals, or parts thereof; the restraint or detention of a marine manual, no matter how temporary; tagging a marine mammal; *the negligent or intentional operation of an aircraft or vessel, or the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal;* and feeding or attempting to feed a marine manual in the wild.

50 C.F.R. § 216.3 (emphasis added).

The relevant statutory exception allows so-called "small takes" and is contained in 16 U.S.C. § 1371(a)(5)(A), which provides:

Upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary [of Commerce] shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock if the Secretary, after notice (in the Federal Register and in newspapers of general circulation, and through appropriate electronic media, in the coastal areas that may be affected by such activity) and opportunity for public comment—

(i) finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock . . .

(ii) prescribes regulations setting forth—

(I) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat. . .

(II) requirements pertaining to the monitoring and reporting of such taking.

*See also* 50 C.F.R. §§ 228.1 & 228.2; *Kokechik Fishermen's Ass'n v. Secretary of Commerce,* 839 F.2d 795 (D.C.Cir.1988), *cert. denied sub nom., Verity v. Center for Environmental Education,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989). A "citizen" is defined to include federal agencies, 50 C.F.R. § 228.3, such as the Coast Guard. "Incidental" taking is defined as "accidental taking." 50 C.F.R. § 228.3. "It does not mean that the taking is unexpected, but rather it includes those takings

which are infrequent, unavoidable or accidental." *Id.*

Thus, the Coast Guard is required to apply for a small take permit if it anticipates that it will take a marine mammal at any time during the course of its operations. It has failed to make such an application. The defendants initially argued that "the MMPA claim must fail because the incidental take statement that *can be* issued by NMFS at the conclusion of the ESA Section 7 consultation process *will* meet the permit requirements of the MMPA." (Defs. Mem. Opp. Prelim. Injunc. at 21) (emphasis added). This statement implicitly concedes that any takings that occur prior to the completion of the process will be in violation of the MMPA. In addition, it bears emphasizing that an incidental take statement may not, in fact, be issued at the end of the consultation process. 50 C.F.R. § 402.14(g)(7) (during formal consultation, NMFS must "[f]ormulate a statement concerning incidental take, *if such take may occur.*") (emphasis added); *cf. Natural Resources Defense Council v. United States Dep't of the Navy*, 857 F.Supp. 734 (C.D.Cal. 1994) (holding that NMFS failure to consider alternative sites in granting small take permit to Navy violated MMPA and NEPA), *vacated*, No. CV 94–2337–SVW(CTx), 1994 WL 715704 (C.D.Cal.1994) (consent decree approved). Indeed, the defendants' most recent representations indicate that NMFS *will not* issue an incidental take statement to the Coast Guard. (*See* Def. Statement Regarding Compliance with the MMPA at 2–3.)

Most significantly, the defendants' initial statement reflected a misunderstanding of the relationship between the ESA and the MMPA. Section 1536(b)(4)(C) of Title 16 and 50 C.F.R. § 402.14(i)(1), which the defendants cited in support of their claim, provide that a taking statement can issue *only if* "the taking is authorized pursuant to section 1371(a)(5)." Thus, the Coast Guard cannot receive an ESA incidental take statement at the conclusion of the consultation process *unless* it already has received a small take permit under 16 U.S.C. § 1371(a)(5) of the

MMPA.[12] As NMFS explained in promulgating regulations to implement the 1986 amendments to the Endangered Species Act:

> The Service [NMFS] notes that H.R. 1027 [which was not passed] would have provided an exception to the taking prohibitions of both the ESA and the MMPA through the section 7 consultation process. The rulemaking process of section 101(a)(5) of the MMPA would not have been required. The Service believes that the congressional choice of imposing an additional regulatory process before authorizing the incidental taking of listed marine mammals reflected a concern for the need for more safeguards rather than a concern for simplification.

*Incidental Take of Endangered, Threatened and Other Depleted Marine Mammals*, 54 Fed.Reg. 40,338, 40,341 (1989).

In large part because the Coast Guard has killed two Northern Right whales without a small take permit, I find that summary judgment should not be granted for Coast Guard as to Count X. Viewing the facts in the light most favorable to Strahan, there is sufficient evidence to justify an order for initiation of a MMPA small take permit application to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.A. § 706(1) (West 1994) (APA). And given the defendants' resistance to initiating the application process, continued oversight is necessary. Accordingly, I will deny defendants' motion for summary judgment on Count X.

In Count VII of his Complaint, Strahan contends that the Coast Guard should be ordered to enforce the provisions of the MMPA. The Coast Guard's record of enforcement of the MMPA last year can most charitably be described as lethargic. By its own calculations, there were fewer than six Coast Guard enforcement actions under the MMPA in fiscal year 1994, which was down from a high of 94 in fiscal year 1992. (Christovich Decl. Ex. 1.) Nevertheless, I will grant the Coast Guard's motion for summary judgment with respect to Count VII, noting that the Coast Guard recently has increased its efforts to enforce the MMPA, (Defs. Mem.

---

**12.** Because an opportunity for public comment must be afforded before a small take permit may issue, NMFS has estimated that the process of receiving a small take permit usually will take approximately one year. 54 Fed.Reg. at 40338.

Support Mot. Summ. Judgment Ex. A), and more fundamentally, because Strahan cannot overcome the presumption of unreviewability for decisions not to undertake enforcement action. *See generally, Heckler v. Chaney, supra.*

## C. *National Environmental Policy Act*

The National Environmental Policy Act (and its implementing regulations) requires that the responsible agency official prepare an Environmental Impact Statement for every recommendation or report on proposals for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) (1988 & Supp. V); *see also* 40 C.F.R. § 1508.27 (definition of "significantly"). The term "major" "reinforces but does not have a meaning independent of [']significantly[']." 40 C.F.R. § 1508.18 (West 1994).

Unless an agency initially decides to prepare an Environmental Impact Statement, an agency must prepare an Environmental Assessment, *see* 40 C.F.R. § 1508.9, in order to determine whether an action will have a significant impact on the environment and therefore require the completion of an Environmental Impact Statement. 40 C.F.R. § 1501.4(c).

As the First Circuit has explained, NEPA "seeks to create a particular bureaucratic decisionmaking process, a process whereby administrators make important decisions with an informed awareness of how the decision might significantly affect the environment." *Sierra Club v. Marsh,* 872 F.2d 497, 497 (1st Cir.1989) (Breyer, J.); *see also Andrus v. Sierra Club,* 442 U.S. 347, 349–52, 99 S.Ct. 2335, 2336–38, 60 L.Ed.2d 943 (1979). In *Sierra Club v. Marsh,* the court held that a district court must consider the harm to the environment that may result from an agency decision made without an Environmental Impact Statement in deciding whether to grant a preliminary injunction. 872 F.2d at 504–05.

The way that harm arises may well have to do with the psychology of decisionmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built. But the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once started, still seems to us … a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction. 872 F.2d at 504.

In Count IV of his Complaint, Strahan alleges that the Coast Guard has violated NEPA by failing to prepare an Environmental Assessment for its operation of vessels and its documentation and inspection activities. The defendants admit that the Coast Guard has not yet completed an Environmental Assessment "that assesses the potential environmental effects, of its operations of vessels, or its documentation of vessels." (Amended Answer ¶66.) The defendants assert that the Coast Guard has taken no action subject to NEPA because:

When a federal agency conducts on-going operations of a fully operational program in existence before the enactment of NEPA, no NEPA action has occurred *unless* a new action, which "entails a further major action that would occur after NEPA's effective date and that would significantly affect the quality of the human environment."

(Defs. Mem. Opp. to Prelim. Injunc. at 23 (citation and footnotes omitted).) The defendants add that the Coast Guard's "daily activities are part of the operational flexibility that Congress contemplated when it established the USCG in 1915, prior to the effective date of NEPA, January 1, 1970." *Id.*

The defendants draw too sharp a distinction between "old" and "new" actions.[13] Of course, NEPA cannot apply to an agency action completed before NEPA took effect. And, by its own terms, NEPA applies only

---

**13.** In addition, the desire for "operational flexibility" cannot trump NEPA's requirements. An agency may decide, after undertaking an Environmental Impact Statement, to continue its operations without modification. NEPA does not dictate any particular outcome, but it does require that particular procedures be followed.

to major actions that significantly affect the quality of the human environment. However, the fact that a "major" agency action is taken as part of an on-going program instead of a recently established program is of no consequence. *See, e.g., Jones v. Lynn,* 477 F.2d 885 (1st Cir.1973) (holding that environmental study must be prepared if additional federal funds were to be provided for urban area renewal project that had been approved prior to passage of NEPA). A "major federal action" includes "continuing activities," 40 C.F.R. § 1508.18, such as the "expansion or revision of ongoing programs," S.Rep. No. 91–296, at 20 (1969) (quoted in *Andrus v. Sierra Club,* 442 U.S. at 363 n. 21, 99 S.Ct. at 2344 n. 21), as well as "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive...." 40 C.F.R. § 1508.18(b)(3).

Although the Marquardt Declaration submitted by the defendants indicates that the Coast Guard plans to complete an Environmental Assessment, (Marquardt Decl. ¶ 3), the Coast Guard originally stated, in its Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, that it "will make a determination of whether any voluntary NEPA analysis is prudent at the conclusion of the [Endangered Species Act] consultation process[,]" (Def. Mem. Opp. Prelim. Injunc. at 23). That statement reflected an unduly restrictive view of NEPA's requirements. "Actions" subject to NEPA "include the circumstance where the responsible officials fail to act and that failure is reviewable by the courts ... under the APA or other applicable law as agency action." 40 C.F.R. § 1508.18. A NEPA analysis, including, at a minimum, an Environmental Assessment, will be mandatory, rather than voluntary, for any concerted actions the Coast Guard plans to take, such as support for aerial monitoring of the Northern Right whale calving season. (Marquardt Decl. ¶ 5.) *Cf. Progressive Animal Welfare Society v. Dep't of the Navy,* 725 F.Supp. 475 (W.D.Wash.1989) (holding Navy's decision to "deploy" dolphins at submarine base was major federal action requiring analysis under NEPA).

The defendants have since changed their position, however. In their Memorandum in Support of their Motion for Summary Judgment, the defendants state that "the Coast Guard will voluntarily prepare an environmental assessment ('EA') under the National Environmental Policy Act ('NEPA') ... examining the effects of its operations and the cumulative effects of operations of non-Coast Guard vessels in light of information and advice generated by the ESA consultation." (Defs. Mem. Mot. Summ. Judgment at 6.) Although this statement is a step in the right direction, it is not fully consistent with the language and spirit of NEPA, as explained in *Sierra Club v. Marsh.* Nor is Strahan's effort to expand NEPA, however.

Strahan has challenged the vessel operations and documentation activities of Coast Guard. (Complaint ¶ 66.) The Coast Guard's documentation and inspection of individual vessels are not subject to NEPA because these duties are local in nature as well as mandatory.[14] *Cf. Kleppe v. Sierra Club,* 427 U.S. 390, 402, 96 S.Ct. 2718, 2726–27, 49 L.Ed.2d 576 (1976) ("Absent an overall plan for development, it is impossible to predict the level of coal-related activity that will occur in the region ... and thus impossible to analyze the environmental consequences ...."); *Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) (HUD's performance of mandatory duty of approval and registration of statement of record and property report did not require EIS).

Coast Guard vessel operations, however, do require preparation of an Environmental Assessment. For example, in *Runway 27 Coalition, Inc. v. Engen,* 679 F.Supp. 95 (D.Mass.1987) (Keeton, J.), the court held that the Federal Aviation Administration was required to complete an Environmental Assessment for changes in certain runway flight patterns. *Cf. Valley Citizens for a*

**14.** *See* 46 U.S.C. §§ 3309, 3301, & 3305.

*Safe Environment v. Vest,* No. 91–30077–F, 1991 WL 330963 (D.Mass.1991) (Freedman, C.J.) (noting Air Force issued an EIS concerning operation of C–5A transport planes).

Although defendants promise to complete an Environmental Assessment, they have not yet done so. An Environmental Assessment must be completed before the Coast Guard can determine whether to issue a finding of "no significant impact," *see* 40 C.F.R. § 1501.4(e) & § 1508.13, or to prepare an Environmental Impact Statement. In addition, the public must be involved in the Coast Guard's efforts to comply with NEPA. *See* 40 C.F.R. § 1506.6. Finally, the regulatory framework envisions coordination between ESA consultation and NEPA review. *See* 51 Fed.Reg. at 19,938–19,939; 50 C.F.R. § 402.06. Under these circumstances, it is appropriate to enter an order requiring initiation of NEPA environmental assessment procedures to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 702(1)(APA). Thus, I will deny defendants' motion for summary judgment on Count IV.

## D. *Whaling Convention Act*

The Whaling Convention Act was enacted in 1949 to give effect to the 1946 International Convention for the Regulation of Whaling. S.Rep. No. 814, 81st Cong., 2d Sess., *reprinted in* 1950 U.S.C.C.S. 2938. The Act makes it unlawful for any person subject to the jurisdiction of the United States "to engage in whaling in violation of the convention or of any regulation of the [International Whaling] Commission, or of this subchapter, or of any regulation of the Secretary of Commerce ..." 16 U.S.C. § 916c(a)(1) (1988 & Supp. V). "Whaling" is defined as "the scouting for, hunting, killing, taking, towing, holding onto, and flensing of whales, and the possession, treatment, or processing of whales or of whale products." 16 U.S.C. § 916(j) (1988 & Supp. V). The historical context of the statute as well as the plain language make it clear that, even crediting Strahan's factual allegations, neither the Coast Guard nor the whale watching ships, such as the New England Aquarium's "Voyager II," have engaged in "whaling" in violation of the Whaling Con-

vention Act. Thus, I will grant summary judgment for the defendants with respect to Count VIII.

## V. *Strahan's Motion for Preliminary Injunction*

It can be argued that a preliminary injunction should not issue against a federal agency that has initiated formal consultation with NMFS under Section 7 because the agency is seeking to fulfill its statutory obligations and any court interference with the process would be unduly intrusive. Some support for this position may be found in the legislative history of the 1982 Amendments to the Endangered Species Act, which added the provision allowing federal agencies to receive an incidental take statement upon completion of the Section 7 consultation process. The House Merchant Marine and Fisheries Committee explained that:

> If the specified impact [in the incidental take statement] is exceeded, the Committee expects that the Federal agency ... will immediately reinitiate consultation since the level of taking exceeds the impact specified in the initial Section 7(b)(4) statement. In the interim period between the initiation and completion of the new consultation, the Committee would not expect the Federal agency ... to cease all operations unless it was clear that the impact of the additional taking would cause an irreversible and adverse impact on the species.

H.R.Rep. No. 97–567, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.C.C.A.N. 2807, 2827. This statement may be read to allow takings in excess of an authorized amount so long as Section 7 consultation is in progress. NMFS has read the statement narrowly, however, by warning that it "will enforce the taking prohibitions of section 4(d) or 9 if the continuation of an action, after the anticipated level of incidental take has been reached, results in additional takings of listed species." 51 Fed.Reg. at 19,954. As the NMFS warning indicates, in order to be consistent with the purpose of the ESA, as explained in *TVA v. Hill,* it is not appropriate to read the House Committee's exception too broadly. It certainly is not appropriate to extend the exception to apply to this case, where the federal agency at issue has not yet applied

for an incidental take permit or an incidental take statement and has been informed by NMFS that it probably *cannot* receive an incidental take statement. Because no blanket exception to Section 9 of the ESA applies to federal agencies that have initiated formal consultation with NMFS, I must ask whether a preliminary injunction should issue against the Coast Guard.

In general, a court will consider the following four factors in determining whether to issue a preliminary injunction:

1. The likelihood of success on the merits; 2. The potential for irreparable injury; 3. The balancing of the relevant equities (most importantly, the hardship to the non-movant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld); and 4. The effect on the public interest of a grant or denial of the restrainer.

*Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991) (citations omitted).

Congress, however, has cabined the traditional exercise of equitable discretion by courts considering a violation of the ESA. *See generally, TVA v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978). Nevertheless, proof of likelihood of success on the merits remains fundamental. *Id.; Conservation Law Foundation of New England, Inc. v. Andrus,* 617 F.2d 296 (1st Cir. 1979) (denying stay of sale of oil and gas leases pending appeal because plaintiffs had not demonstrated likelihood of success on the merits or irreparable injury); *Sierra Club v. Marsh,* 816 F.2d 1376, 1382 (9th Cir.1987); *National Wildlife Federation v. Burlington Northern Railroad, Inc.,* 23 F.3d 1508, 1510–1511 (9th Cir.1994). And the First Circuit has noted that when the interim relief sought by the plaintiff " 'is essentially the final relief sought, the likelihood of success should be strong.' " *In re Pye,* 38 F.3d 58,63 (1st Cir.1994) (citation omitted); *see also Gately v. Commonwealth of Massachusetts,* 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied,* 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

In order for an injunction to issue under the ESA, Strahan must establish that "actual harm" or "harassment" to an endangered species will be caused by the Coast Guard's vessel activities. The First Circuit has held that "a significant risk of harm" is not enough to establish a taking under the ESA. *See American Bald Eagle v. Bhatti,* 9 F.3d 163, 167 n. 5 (1st Cir.1993). In *American Bald Eagle,* the plaintiffs sought an injunction to stop a deer hunt on a state reservation where a bald eagle restoration project was located. The District Court denied a preliminary injunction as well as a permanent injunction on the ground that the limited hunt "did not pose a significant risk of harm to the bald eagles." 9 F.3d at 164–65. The First Circuit, applying the "actual harm" test, affirmed, finding that there was "no evidence in the record of any harm to the bald eagles at Quabbin [reservation] as a result of the 1991 deer hunt." *Id.* at 166. The Court also noted that, "[t]here is no evidence that any eagles at Quabbin actually ingested lead slug or that any eagles ate deer carrion containing lead slug." *Id.* Although the decision focused on the "harm" element of a taking rather than the "harassment" element, the Court noted in a footnote:

> Because appellants have not shown that bald eagles have ingested lead slugs nor fragments thereof during past hunts or will ingest lead slugs or fragments thereof during future hunts, we have no reason to consider whether the ingestion of lead slugs or fragments thereof would lead to a disturbance of the eagles' behavior pattern to the extent that it would amount to "harassment" of the bald eagles.

9 F.3d at 166 n. 4.

Strahan, unlike the plaintiffs in *American Bald Eagle,* has shown that Coast Guard operations have actually harmed at least two Right whales since 1991. In addition, Strahan has submitted evidence that, when viewed in the light most favorable to his claims, suggests "actual harm" and "harassment" occurs when Coast Guard vessels approach Right whales too closely. (Neuhauser Aff. at ¶ 5–¶ 8; NMFS Final Rule, 59 Fed.Reg. at 28,796.)

Nevertheless, I find that, in light of the Coast Guard's substantially increased efforts to avoid Right whales as part of its new Whale Protection Program, Strahan has not

demonstrated a strong likelihood that there will be actual harm, inflicted by the Coast Guard in "taking" a Right whale in the foreseeable future, sufficient to warrant the issuance of a preliminary injunction restricting Coast Guard operations pending completion of the formal consultation process.

I find, however, that Strahan is entitled to a preliminary injunction directing the Coast Guard to fulfill the procedural requirements of the ESA, MMPA, and NEPA. In order to discipline Coast Guard compliance with these requirements, I will enter certain temporal and procedural directives:

With respect to ESA Section 7, the defendants will be directed neither to seek nor acquiesce in an extension to the time frames established by ESA Section 7(b) without prior approval by this Court. The defendants will be required to submit a status report to this Court on October 2, 1995, detailing the defendants' determination on how they intend to proceed with United States Coast Guard actions in light of that agency's obligations under ESA Section 7 and the anticipated NMFS Biological Opinion.

With respect to ESA Section 9, defendants will be directed to record incidents involving whale strikes by Coast Guard vessels and promptly report any resulting injuries of Northern Right whales to this Court and to NMFS.

With respect to the MMPA and ESA Section 9, defendants will be directed to apply for a small take permit from NMFS, pursuant to 16 U.S.C. § 1371(a)(5)(A) and 50 C.F.R. § 228.1 & § 228.2, for all Coast Guard operations that may accidentally "take" a Northern Right whale, regardless of whether defendants consider the possible taking unlikely.

With respect to NEPA, defendants will be directed to prepare by June 30, 1995, a draft Environmental Assessment covering the Coast Guard actions addressed in the Biological Assessment submitted to NMFS on March 31, 1995. Defendants will be required to submit to this Court by June 30, 1995, a copy of the draft Environmental Assessment and an anticipated schedule for completion of a final Environmental Assessment and an Environmental Impact Statement or a "Finding of No Significant Impact," whichever is applicable. The schedule shall incorporate the public involvement directives of 40 C.F.R. § 1506.6.

## VI. *Conclusion*

For the reasons set forth more fully above, Defendants' motion for summary judgment is GRANTED as to Counts II, V, VI, VII and VIII; and DENIED as to Counts I, III, IV, IX and X. Plaintiff's motion for a preliminary injunction is GRANTED in part. Defendants' motion for sanctions is DENIED. Plaintiff's motion for temporary restraining order and plaintiff's motion for judgment on his motion for preliminary injunction are DENIED.